**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| EVAN FERMAINT, an individual, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  1:18-cv-7325 |
| | ) | |
| v. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| PLANET HOME LENDING, LLC, | ) | |
| a Delaware limited liability company, and | ) | |
| MORTGAGE CONTRACTING SERVICES, LLC, | ) | |
| a Delaware limited liability company, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' JOINT
MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR PARTIAL SUMMARY JUDGMENT [DOC. 160]**

Plaintiff Evan Fermaint ("Evan" or "Fermaint"), by his counsel, hereby submits his

response in opposition to Defendants' Joint Memorandum of Law in Support of its Motion for

Summary Judgment [Doc. 160], as follows:

## INTRODUCTION

The Defendants' joint motion is unsupported in fact or law. The motion is nothing more

than blatant omissions of controlling and persuasive case law and a selective presentation of facts

to provide the thinnest possible veneer of plausibility to the motion. However, when compared to

the actual relevant facts and the controlling case law, it is readily apparent that there is no legal or

factual support for the Defendants' positions.

The Defendants' motion is a contrivance doomed to fail when compared against relevant

facts and controlling law. If the Defendants motion acknowledged the known relevant facts and

the controlling case law, it is likely this motion would have been much more limited or would not

have been filed at all. Fermaint's argument in opposition to this motion follows. Needless to say, Fermaint believes that this motion should be denied *in toto*.

## STANDARD OF REVIEW

A motion for summary judgment is appropriate only if the pleadings, answers to interrogatories, admissions, affidavits and other material show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[D]isputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether she is ruling on a motion for summary judgment or for a directed verdict." *Id.* "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. The *Anderson* court also noted that this standard mirrored the standard for a directed verdict which is "if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *Id.* at 250-51 (internal citations omitted).

## RESPONSE TO PLANET AND MCS "FACTS"

Fermaint files concurrently herewith his response to the Defendants' Statement of Facts ("SOF") and his own Statement of Additional Facts ("SOAF"). There are very few facts cited by the Defendants in their SOF that are truly undisputed. Therefore, in addition to being wrong on the law, much of the Defendants' motion must be denied because there are no uncontroverted facts to

support the arguments offered.

## ARGUMENT

### I. FERMAINT HAS SUFFICIENT EVIDENCE THE DEFENDANTS REMOVED HIS PROPERTY AND ISSUES OF FACT ARE READILY APPARENT.

The law of conversion and negligence in this circuit places the burden upon the defendants for the disappearance or loss of personal property of another while in the defendants' possession and the disappearance of that property triggers either conversion or negligence liability upon them. *See Refrigeration Sales Co., Inc. v. Mitchell-Jackson, Inc.*, 770 F.2d 98, 101-02 (7th Cir. 1985) (explaining the forgoing proposition of law has a divergence of authority as to whether unexplained disappearance of property under bailment constitutes negligence or conversion). In this case, it is undisputed that Defendants unlawfully entered the Plaintiff's home and took possession of it for approximately 60 days. Defendants' SOF ¶ 63-64 and 96; SOAF ¶ 16. There exists both circumstantial and direct evidence that Defendants removed Fermaint's personal property or that the property disappeared while the premises was under the defendants' exclusive control. "Circumstantial evidence is the proof of certain facts and circumstances from which the fact finder may infer other connected facts which usually and reasonably follow according to the common experience of mankind." *Eskridge v. Farmers New World Life Insurance Co.*, 250 Ill. App.3d 603, 621 (1st Dist. 1993).

   a.   *The undisputed facts show defendants' possessed Fermaint's home and were present at the time Fermaint's property was removed.*

The Defendants first argument ignores the record evidence. Multiple people who were employed by the Defendants entered and remained upon the property for extended periods of time. Among the contractors in the Planet – MCS chain is FTP Investments LLC ("FTP"). In August of 2018, MCS issued a work order to FTP to secure Fermaint's home. FTP carried out the order by

drilling the front door lock and removing Fermaint's realtor's lockbox then present on the door and replacing the lock with a new lock and key which was placed in MCS's lockbox placed on the door by FTP at the direction of MCS. Defendants' SOF ¶ 64. In September 2018 MCS received from Planet several more work orders which made their way to FTP among other companies. Defendants' SOF Exhibit G at Exhibit 24 (*PageID # 2305, 2307-2308*); SOAF Exhibit M, Exhibits 19, and 20.

More specifically, FTP assigned to Michael Levy Sr. and Michael Levy Jr. the tasks of draining a swimming pool and trimming shrubs at Fermaint's home. The events surrounding this job led Fermaint's neighbors to call the police and report three men being present at Fermaint's home removing property and placing it on a truck. SOAF Exhibit L, Deposition of Michael Levy Jr. at Exhibit 19. An investigation ensued by the Bridgeview Police Department.

During Detective Matusiak's investigation of the burglary of Fermaint's home, Michael Levy, Jr. told Detective Matusiak he witnessed another individual removing property from Evan's home. SOAF Exhibit L at Exhibit 19. A neighbor, Kathleen Leon, reported to detective Matusiak that she observed three black males removing items from Evan's residence and loading them onto a red flatbed tow truck at approximately 1:00 and 1:30 p.m. on September 19, 2018. Defendants' SOF Exhibit J at 9:7-11:20, (*PageID #s 2602; 2604*). Mrs. Leon confirmed her recollection of the events were better on September 19, 2018 than at her deposition and she has no reason to disagree with the investigative report. SOF Exhibit J, 19:15-19, (*PageID #s 2612*).

     b.    *Ana Lozano's testimony corroborates Fermaint's claim as to the condition of his home and presence of his personal property prior to the defendants' trespass.*

Whether the MCS work orders sought the removal of personal property or not, that fact is not determinative of whether Fermaint's personal property was removed. Fermaint retained Ana Lozano to act as his realtor in his efforts to short sale his home. The deposition testimony of Ana

Lozano confirms she saw in the home many, if not all, of the items of personal property that Evan claims were stolen dating back to June 2018.  Defendants' SOF Exhibit F at 13:24 (*PageID # 1626*); 16:1-18:3 (*PageID #s 1629, 1631*), 25:5-26:6 (*PageID #s 1638-39*).  Ana first entered the property for a prelisting inspection  on approximately June 1, 2018. (SOF Exhibit F, 13:21-25; 14:1). Ana testified she  "has to" walk about the home to ascertain the condition of the home in order to determine if photographs should be taken for marketing purposes. (SOF Exhibit F, 14:1-16).  Lozano confirmed seeing items such as a futon; TV; dirt bikes and bicycles. (SOF Exhibit F, 78:18; 79:13; 82:2; 43:5).

Moreover, Lozano testified that the home looked "a little more organized" when she first walked through the home than the photographs she was shown at her deposition. SOF Exhibit F, 70:4-23 (*PageID # 1683*) ref (*PageID #s 1771-87*). Lozano was shown photographs taken by MCS's vendors of the inside of the home after they had gained entry. Lozano  confirmed that in June when she listed the home none of the boxes were tipped over, sitting in the middle of the hallways, or had their contents laid on the floor. SOF Exhibit F, 81:12-18 (*PageID # 1694*).  In June, all of the boxes were in the corners of the bedrooms and along the wall. SOF Exhibit F, 80:16-25 (*PageID # 1693*); 90:22 (*PageID # 1703*).

With respect to the photos of the home's interior rooms produced by the defendants and their agents, they do not prove that the agents of the defendants did not ransack the property. Rather, they simply show that the ransacking of the home occurred before the photos were taken. Lozano's testimony and the defendants' own photographs provide independent corroboration to Fermaint's claim that his home was ransacked. SOF Exhibit F, 70:4-23 (*PageID # 1683*). Further, given the absence of evidence any criminal third party gained entry into Fermaint's home, there is a reasonable inference MCS's vendors ransacked the property and removed any items they

believed valuable before taking their photographs. Response to SOF No. 89.

Lastly, and most importantly, once the Defendants changed the locks and excluded Fermaint from the property their trespass renders them liable for all damages that followed. Also, it cannot be overemphasized that Fermaint's claims for trespass and ICFA unfairness are not limited to the stolen personal property. Even if the Court agreed that Fermaint cannot present sufficient evidence to go to the jury on the question of the Defendants' theft of his personal property these claims would continue. The Defendants trespassed upon Fermaint's property in violation of law and dispossessed him of the home and his personal property within the home for a period of time. These acts are actionable even if the defendants could affirmatively prove they did not steal any personal property.

## II. THE LAWFULNESS OF THE DEFENDANTS' ENTRY INTO FERMAINT'S PROPERTY MUST BE DETERMINED BY REFERENCE TO ILLINOIS LAW

### a. *Illinois Law Governs the Defendants' Conduct*

The provisions of the Illinois Mortgage Foreclosure Law ("IMFL") controls a mortgagee's right of possession. 735 ILCS 5/15-1701(f)." *Thakkar v. Ocwen Loan Servicing, LLC*, 2019 WL 2161544, at *4 (N.D. Ill. 2019). Paragraph 5 of Fermaint's mortgage states: "Lender may inspect the Property if the Property is vacant or abandoned or the loan is in default. Lender may take reasonable action to protect and preserve such vacant or abandoned Property." Defendants' SOF ¶ 7. However, Paragraph 14 of Fermaint's mortgage states it is governed by "Federal law and the law of the jurisdiction in which the property is located." Planet's servicing of Fermaint's mortgage must also comply with the standards set out in the FHA Single Family Housing Policy Handbook because the instrument is an FHA mortgage and is insured by the FHA. *See* Mortgage at page 1 showing the FHA Case No. of 137-3663318-703 and the caption in the lower left of each page indicating the form mortgage is an "FHA Illinois Mortgage 4-96." (*PageID #s 1214-20*).

Planet and MCS wholly fail to acknowledge their obligation to conform their practices to comply with Illinois law. This is despite HUD's requirement that any delinquent mortgage be serviced in accordance with FHA requirements and all applicable laws. *See* <u>SOAF Exhibit V, page 643</u>. The mortgage terms and the FHA servicing standards demonstrate that Planet's rights of inspection, protection, and preservation of Fermaint's property are to be determined by Illinois law.

With respect to property preservation and protection practices, the FHA requires servicers to alter their practices to conform to the laws of the jurisdiction where the property is located if they are more restrictive than the requirements set out by the FHA. In fact, the FHA's single family servicing guides expressly state: "[m]ortgagees are not exempt by HUD policy from adhering to state and local laws relating to the P&P [Preservation & Protection] of Properties securing FHA-insured Mortgages." *See* <u>SOAF Exhibit V, pg. 756</u>. This same cited section imposes a duty on Planet and MCS to comply with any restrictions on their property preservation and protection practices imposed by Illinois law.[1] It is through this prism, dictated by the supremacy of the IMFL, that the reasonableness *vel non,* of the Defendants' actions must be measured. Planet filed its complaint to foreclose on Fermaint's property on May 26, 2017. <u>SOF ¶ 11</u>. Thus, foreclosure was active in this case more than a year prior to the first entry into Fermaint's property by any Defendant, or any Defendant's vendor, and compliance with the IMFL was and is mandatory.

b.    *The IMFL Controls the Defendants Ability to Enter Fermaint's Property*

Because foreclosure had been commenced at the time of these occurrences, the IMFL, 735 ILCS 5/15-1101 *et seq.*, governs and controls rights of possession. Section 1701 of the IMFL provides that "[p]ossession under this Article includes physical possession of the mortgaged real

---

[1]  "P&P of Properties" in the cited Manual section refers to property preservation and protection.

estate to the same extent to which the mortgagor, absent the foreclosure, would have been entitled to physical possession." 735 ILCS 5/15-1701(a). It also states that, except as authorized by the IMFL, no mortgage or other instrument may supersede its provisions. 735 ILCS 5/15-1701(f)." *Thakkar v. Ocwen Loan Servicing, LLC*, 2019 WL 2161544, at *4 (N.D.Ill., 2019).

Since there was a pending foreclosure case without a judgment of foreclosure entered, Planet was required to seek the foreclosure court's permission to obtain possession of Fermaint's home pursuant to 735 ILCS 5/15-1701(b)(1). "The right of a mortgagor to possess his residence during foreclosure can be overcome only if "(i) the mortgagee shall object and show good cause, (ii) the mortgagee is so authorized by the terms of the mortgage or other written instrument, *and* (iii) the court is satisfied that there is reasonable probability that the mortgagee will prevail on a final hearing of the cause." 735 ILCS 5/15–1701(b)(1)" *Boyd v. U.S. Bank, N.A., ex rel. Sasco Aames Mortg. Loan Trust, Series 2003-1*, 787 F.Supp.2d 747, 756 (N.D.Ill.,2011).

  c.    *The Defendants Did Not Seek or Obtain Foreclosure Court Permission to Take Possession of Fermaint's Property*

No Defendant sought or received the foreclosure court's permission to take possession of Fermaint's home. SOAF ¶ 5-7. The *Boyd* court found that a failure to obtain the foreclosure court's permission to take possession, breaking into and ransacking the plaintiff's home, changing the locks to [Boyd's] doors, and dispossessing [Boyd] of his home offended the public policy embodied by the IMFL and was actionable as a violation of the ICFA. *Boyd*, 787 F.Supp.2d at 756-57.

Planet and MCS may attempt to justify their conduct as simply securing Fermaint's property. However, this ignores the requirements imposed by the FHA upon Planet and its agents. These standards required Planet and MCS to conform their property preservation and protection practices to the requirements imposed under Illinois law, including the IMFL. Since Planet and

MCS failed to seek or receive permission from the foreclosure court to obtain possession of Fermaint's property, their actions were undertaken in violation of law, these acts constitute trespass, and the conduct violates the ICFA. For these reasons, the remainder of Defendants' arguments premised upon having permission to enter the premises must fail.

> d.    *Paragraph 5 of the Mortgage Does Not Authorize Entry Into the Interior of Fermaint's Home*

Perhaps the greatest shortcoming of Planet and MCS's legal position is their overreliance on Paragraph 5 of Fermaint's mortgage to excuse their conduct. Planet and MCS have greatly overreached in their reading of this provision. Planet and MCS rely upon two sentences out of a larger paragraph. <u>SOF Exhibit B at pg. 18 (*PageID # 1216*).</u> Those sentences simply state:

> "Lender may inspect the Property if the Property is vacant or abandoned or the Loan is in default. Lender may take reasonable action to protect and preserve such vacant or abandoned Property."

There are serious problems with Defendants' reliance on these two sentences. The first sentence merely authorizes an inspection of the Property, nothing more. This first sentence provides no distinction between an interior and an exterior inspection. Planet and MCS simply make a logical leap to argue "[t]he Mortgage plainly allows the lender to enter the Property…" <u>Defendants Joint Memorandum at 10</u>. This is a fatal leap of logic.

The Defendants have not demonstrated this sentence ever authorized them to enter the interior of Fermaint's home absent compliance with 735 ILCS 5/15-1701(b)(1). This fatal leap of logic underpins Defendants' remaining arguments. Planet and MCS also fail to recognize any limits on their right to protect and preserve the property. This is despite the obligations imposed by Illinois law.

Besides Paragraph 5's silence as to the type of inspection, there are no explicit requirements or agreements allowing the Defendants to conduct an *interior* inspection of Fermaint's home. The

requirement to enter Fermaint's home is imposed by the FHA guidelines for handling first time vacancies. SOAF Exhibit V, pg. 660. Since Planet and MCS were required to conform their practices to the requirements of Illinois law, they cannot claim reliance on these FHA guidelines as justification to enter the interior of Fermaint's home where this provision conflicts with the IMFL. Without more, the Defendants cannot assert that the permissions granted in Paragraph 5 of the Mortgage included undertaking an internal inspection or taking actual and physical possession of the property.

The Defendants' rights to take "reasonable actions" under Paragraph 5 are circumscribed by applicable law as well. For instance, the requirements imposed by federal law limit the Defendants' rights here. Discussing property preservation, 24 C.F.R. §203.377 expressly states: "The mortgagee shall take reasonable action to protect and preserve such security property when it is determined or should have been determined to be vacant or abandoned until its conveyance to the Secretary, *if such action does not constitute an illegal trespass*. (Emphasis Supplied). Whether the conduct constituted a trespass is determined by Illinois law.

    *e.    The Defendants' Actions Were Not Reasonable.*

Planet and MCS's actions in this case are not reasonable. They are rather illegal and actionable by Fermaint. The defendants have omitted any discussion of any limits upon their right to provide property preservation services. These limits are extensive.

First, Planet and MCS acknowledge the property was listed for short sale by Fermaint on June 4, 2018 with a realtor. SOF ¶ 17. According to FHA guidance, Fermaint remained responsible to maintain the Property in "ready to show" condition, including all normal property maintenance activities. SOAF Exhibit V, pg. 699. Therefore, Planet had no obligation to provide inspection or preservation services during the short sale process.

Second, Planet and MCS attempt to make hay over where Fermaint slept at night between October of 2017 and June of 2018. This is absolutely irrelevant to this case. The Defendants critically fail to acknowledge they only learned this fact during discovery in this case. According to Planet's records, the first time that Planet believed Evan's home was vacant was June 12, 2018. Defendants' SOF Exhibit G at Exhibit 16 (*PageID # 2263*). It is improper for Planet and MCS to argue anything else with respect to vacancy. This lack of candor simply adds pages to the required response.

Prior to ordering MCS to enter and secure the property in August of 2018, Planet had been aware for two months Fermaint's home was listed for a short sale. (Plaintiff's Response to Defendants' SOF at ¶ 19; SOF Exhibit A at 77:3-82:16 (*PageID #s 1113-18*), 91:4-92:25 (*PageID #s 1127-28*), 93:10-99:25 (*PageID #s 1129-35*); and Plaintiff's SOAF Exhibit U, PHL Loan Servicing Log (Bates 00360-00361). Planet received notice from Fermaint's attorney. Planet received both the law firm's contact information as well as the Real Estate Agent's information, along with Fermaint's authorization to communicate directly with the law firm and the Real Estate Agent. SOF Exhibit H at 40:19-41:2 (*PageID #s 2349-50*) and at Exhibit 3 (*PageID # 2514*). When Planet mailed their letter to the home on June 18, 2018, Planet was already aware the home was listed for a Short Sale with a Realtor, yet Planet did not make any contact with the Realtor or Fermaint's attorney despite having authorization to speak with each of them. SOAF ¶ 29.

Planet also fails to discuss the effect on its position of the home being secured by the Realtor's lockbox when Planet identified a First-Time Vacancy on June 12, 2018. Plaintiff's Response to SOF ¶ 41. The Defendants fail to explain how Fermaint's home was not already secured and protected by virtue of being secured with the realtor's lockbox. The Defendants fail to discuss why any property preservation services were necessary or in compliance with Illinois law

or HUD guidelines cited supra given the facts as they existed in June of 2018. Planet fails to discuss the absence of evidence demonstrating the need for any property preservation services or the legal limits on their obligation to provide these services during the Short Sale process.

The Defendants try to distinguish other cases contrary to their position by discussing *Griffin, Hill,* and *Sifuentes.* Noticeably absent is any discussion of *Boyd, Bywater v. Wells Fargo Bank, N.A.,* 2014 WL 1256103, at *3 (N.D. Ill., 2014); *Hill v. Wells Fargo Bank, N.A.,* 946 F.Supp.2d 817 (N.D.Ill.2013), or *Flippin v. Aurora Bank, FSB*, 2012 WL 3260449, at *3 (N.D.Ill.,2012). Each of these cases found a viable ICFA unfairness claim where the defendants were alleged to have locked the plaintiffs out of their homes and taken their property without a legal or factual basis for doing so. MCS was a defendant in *Flippin* and had these same arguments rejected there. MCS and Planet should have made the Court aware of this authority contrary to their position.

Also, the Defendants' fail to discuss their obligations under the IMFL, or the impact of the Short Sale listing at the first-time vacancy determination, or the home being secured by the realtor's lockbox and being in the possession of the realtor when Defendants were undertaking these inspections. The Defendants certainly cannot reconcile their ongoing property preservation activities with the directives of the FHA mentioned above that shifted this burden to Fermaint to keep the home in "ready to show" condition during the short sale process.

Further, the Defendants attempt to distinguish the facts of this case from *Obradovich* and *Thakkar.* This attempt fails miserably. Undersigned Counsel represented the plaintiffs in both *Obradovich* and *Thakkar.* In *Obradovich,* the mortgage servicer's loss mitigation department had agreed to a short sale contract after which the servicer's pre-foreclosure department ordered a winterization and initial secure of Obradovich's home. This request arose from a drive-by inspection undertaken by a vendor for the servicer's default service provider. Despite the house

being listed for sale and in the process of completing an approved short sale transaction, these unnecessary services went forward. The property preservation vendor failed to properly winterize the radiant heating system which led to burst pipes and flooding in the living room and common areas.

In many respects, this case is very similar to *Obradovich*. Planet and MCS pursued property preservation needlessly while the home was listed with a real estate agent and in the process of a short sale. The Defendants also failed to acknowledge that their obligations to provide property preservation services are abated while the loan is in the process of short sale pursuant to pg. 699 of SOAF Exhibit V. The biggest critical difference in *Obradovich* and this case is the presence of the active foreclosure case. Because there was an active foreclosure in this case, the IMFL provided the only path for Planet to lawfully obtain possession of Fermaint's home. Any other method of obtaining possession is trespass and violates the public policy embodied by the IMFL.

Make no mistake, the initial secure process is understood by the property preservation industry to be taking possession of the property. SOAF Exhibit V, pg. 660. Section (1)(a) states: "A First-Time Vacant (FTV) Property Inspection is the first inspection performed by the Mortgagee to ascertain the condition of a vacant or abandoned Property" and (1)(b) says: "The Mortgagee must perform the FTV Property Inspection on the date *it takes possession* of a vacant or abandoned Property)." (Emphasis supplied). Because the Defendants were acting in compliance with these standards, it is beyond doubt Planet and MCS intended to take possession of Fermaint's home on the day they entered his property. By taking possession of Fermaint's property these Defendants acted with intent to dispossess Fermaint.

In *Thakkar*, Ocwen admitted there was no default at the time of either of the two break-ins perpetrated by Ocwen and Altisource's vendor. In fact, at the time of the second break-in, Ocwen

was no longer the mortgage servicer because Thakkar had refinanced to escape from Ocwen's malignant incompetence. While *Thakkar's* underlying facts are more easily distinguished on the grounds that he was simply never in default, the underlying conduct was the same. In each instance, the Servicer orders the initial secure including the First-Time Vacancy inspection, and the property preservation company undertakes the steps required by the FHA guidelines. In each case the commonality is that the property preservation company, acting at the direction of the Servicer, enters the property with the intent to obtain possession and to dispossess all others from the property. These parties act without complying with either State or Federal law to dispossess consumers such as Fermaint from their homes as quickly as possible.

## III.  PHL IS LIABLE IN TORT FOR THE ACTIONS OF MCS AND ITS CONTRACTORS.

Planet next argues it cannot be liable for the actions of independent contractors, MCS or MCS's contractors. This argument is without merit. Just as Ocwen argued in *Thakkar,* Planet argues that *Jackson v. Bank of New York*, 62 F.Supp.3d 802 (N.D. Ill. 2014) is controlling as to the question of its liability for the acts of MCS and any contractors hired by MCS. Planet argues this rule applies because Planet has no relationship with and, therefore, no control over the actions of the several contractors in this case. This is not such a simple rule.

Restatement (Second) of Torts §877, (1979) states that "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . orders or induces the conduct, if he knows or should know of circumstances that would make the conduct tortious if it were his own." *Janda v. Kwiatkowski*, 2007 U.S. Dist. LEXIS 5427, at *15 (N.D. Ill. 2007). In such a case the injured party may proceed to judgment against any or all of the responsible actors in a single or in several different actions. *See* RESTATEMENT (SECOND) OF TORTS, § 882. *Watts v. Laurent*, 774 F.2d 168, 179 (7th Cir. 1985).

Comment (a) to Restatement (Second) of Torts § 876 states that "parties are acting in concert when they act in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result. The agreement need not be expressed in words and may be implied and understood to exist from the conduct itself." *Cebulske v. Johnson & Johnson*, 2015 U.S. Dist. LEXIS 33042, at *10-11 (S.D. Ill. 2015) (citing Restatement (Second) of Torts § 876, cmt. (a) (1979)). This §876(a) definition hits Planet right between the eyes. This is a direct path to hold Planet liable for all the actions of MCS and any contractor hired by MCS. This is especially true when the Court considers Planet's testimony that no trespass would occur without Planet providing the order to invade the property including the address of the property to be invaded. SOAF at ¶ 18.

Even accepting the defendants' explanation of their relationship at face value, Planet may still be held liable for the conduct of MCS and its vendors under well-established principles of law governing trespass. "The Restatement (Second) of Torts is consistent with this limitation, for it defines liability for trespass as follows: One is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally (a) enters land in the possession of the other, or, causes a thing or a third person to do so." *Lilly Indus. v. Health-Chem Corp.*, 974 F. Supp. 702, 708 (S.D. Ind. 1997). *See also Loukas v. Clear Channel Outdoor, Inc.*, 2013 U.S. Dist. LEXIS 180635, at *4 (N.D. Ill. 2013).

Planet relies primarily upon the authority set out in *Jackson v. Bank of New York*, 62 F. Supp. 3d 802, 813 (N.D. Ill. 2014) (internal citations omitted) for its position that it cannot be liable under a respondeat superior theory for the action of any vendors. *Jackson* is distinguishable from the present case in multiple ways and lacks any utility here. For instance, *Jackson* lacks any substantive discussion of liability under any of the restatement sections and authorities noted infra

by Fermaint including §§ 158(a) or §§875-877 of the Restatement (Second) of Torts. Each of these restatement sections authorize the imposition of liability upon Planet for any third-party's trespass triggered by Planet's order to secure Fermaint's property. *Jackson* also contains no evidence and lacks any discussion of, the contractual relationships of the defendants, or the degree of control that may or may not have been present in those relationships.

Planet spills much ink arguing traditional agency analysis with an emphasis on control of the agents' actions. This "general analysis" is not useful to the present case. See *Lawlor v. N. Am. Corp. of Ill.*, 983 N.E.2d 414, 425 (2012). Illinois law looks to the *Lawlor* factors to distinguish between agents and independent contractors. The primary factor is any retained right to control the manner of doing the work. Additional factors include: (1) the question of hiring; (2) the right to discharge; (3) the manner of direction of the servant; (4) the right to terminate the relationship; and (5) the character of the supervision of the work done. The presence of one or more of the above facts and *indicia* are not necessarily conclusive of the issue. These factors merely serve as guides to resolving the primary question of whether the alleged agent is truly an independent contractor or is subject to control." *Id*. at 427 (Internal citations and ellipsis omitted).

Applying this analysis, to both Planet and MCS's actions here, it is clear the *Lawlor* factors point towards agency. The fifth factor is discussed first because it is likely most relevant to this issue. The fifth factor is the character of the supervision of the work done. Both Planet and MCS have argued they undertook no supervision of MCS's contractors. This is clearly not the case. As noted, despite MCS's false representations in the FSA, MCS does not provide any inspection or preservation services to Planet. Instead, MCS simply communicates Planet's orders to its contractors through its work order. The FSA requires that every work order be completed according to Planet's standards. <u>SOAF at ¶ 23C, D, F, and G</u>. Accordingly, The VSA gives MCS

(and thereby Planet) indirect but absolute supervision over the completion of the work. <u>SOAF at</u> <u>¶ 25</u>. Paragraphs 1(d) and 1l(a) of the VSA, when read together, authorize MCS to assess monetary damages against its vendor, refuse to pay any vendor invoice or reduce the amount paid on any vendor invoice if: (1) the vendor fails to perform any service; (2) fails to perform any service timely; (3) fails to upload any required document or photograph; (4) or fails to perform the services to MCS's satisfaction "in its reasonable discretion." <u>SOAF ¶ 25E, 26</u>. However, the VSA does not define or limit MCS's "reasonable discretion."

A contractual clause of this nature is a satisfaction clause under Illinois law. See *Chen v. Quark Biotech, Inc*., 2004 WL 1368797, at \*3 (N.D. Ill. 2004). When performance is conditioned on the exercise of discretion under a satisfaction clause Illinois law looks to whether the exercise of discretion is purely subjective or requires objective factors. *Id.* "Through a satisfaction clause, a party's exercise of judgment or discretion is a condition for its duty to perform." *Kohler v. Leslie Hindman, Inc.,* 80 F.3d 1181, 1186 (7th Cir.1996))." *HSBC Mortg. Services, Inc. v. Equisouth Mortg., Inc.,* 873 F.Supp.2d 923, 928 (N.D .Ill. 2012). Satisfaction clauses fall into two categories, subjective and objective. Subjective clauses involve the feelings, taste or judgment of the party exercising discretion. The party having such discretion is limited only to exercising that discretion in good faith. *Kohler v. Leslie Hindman, Inc*., 80 F.3d 1181, 1187 (C.A.7, Ill., 1996).

Clearly, a reasonable jury could find that the satisfaction clause in MCS's favor within the VSA grants MCS (and therefore Planet) sufficient control over their local contractor's performance to meet any evidentiary burden necessary for the agency analysis. This subjective satisfaction clause grants MCS complete discretionary control of its obligation to pay any local contractor. This clause means MCS can control the contractor's performance by assessing

damages against the contractor for any perceived breach, and/or withholding or reducing compensation. MCS's level of control is bounded only by the amorphous good faith standard.

As to the factors one and two, hiring and discharge, Planet hired MCS and had the right to terminate MCS. MCS hired its contractors and had a right to discharge them. As to the third factor, the manner of direction of the servant, the actual implementation of the agreements demonstrates that MCS is simply a conduit of Planet's instructions to MCS's contractors via the MCS work order. MCS's contractors then entered Fermaint's home, changed the locks and caused the loss of personal property based upon Planet's orders. The VSA imposed on the contractors the obligation to follow Planet's directions as embodied by the MCS work orders and complete those work orders within Planet's specified time subject to loss or diminution of compensation or even the imposition of money damages. SOAF ¶ 23B,C, F; 24; 25C-D; 26. The fourth factor is the right to terminate the relationship. It appears each party had the right of termination.

The presence of the satisfaction clause and the unlimited control of compensation wielded by MCS to accomplish Planet's purposes is powerful evidence MCS controls all its vendor's actions for the benefit of Planet. Clearly, this evidence is more than sufficient to create a jury question of agency in this case. The satisfaction clause coupled with the other contractual provisions and evidentiary submissions make clear there is substantial evidence from which a jury could find agency. Similarly, Planet has admitted its order to secure Fermaint's property sets into motion a process by which another party would unquestioningly invade that property through a trespass. SOAF at ¶ 18-19. This trespass is an illegal action resulting directly from Planet's order. Also, the contractual terms requiring unquestioning obedience to the orders received constitute sufficient control as to make the remaining parties Planet's agent. SOAF ¶

20-27. SOAF ¶¶ 20-27 demonstrate that Planet's orders as to both the type of work to be done, and how quickly the work must be done, are communicated to MCS's vendors by use of MCS's system. MCS's contract, the VSA, then gives MCS complete control over how the services are performed through its contractual terms. MCS communicates Planet's wishes to its contractors via a work order. Then, MCS uses the satisfaction clause as both a stick and carrot to ensure Planet's orders are carried out. The right to assess money damages, coupled with the right to reduce or eliminate compensation requires MCS's vendors to jump to MCS's every command. Like in *Lawlor,* the jury could infer that Planet's knowledge that illegal acts would follow its orders would render MCS and any other contractors as Planet's agents for purposes of these facts.

Planet also argues that if there is no principal-agency relationship, then Planet deserves judgment on all Fermaint's claims. However, *Jackson* does not stand for that proposition. *Jackson* only involved the question of whether the loan servicer could be *vicariously* liable for trespass, conversion, and invasion of privacy on a principal-agent theory. As noted, *Jackson* did not consider direct liability under any of the Restatement sections Fermaint has identified, i.e., §158(a) or §§875-877. *Jackson* undertook a traditional agency analysis without consideration of any of the rules of direct liability that are set forth in these Restatement sections relied upon by Fermaint. *Jackson* also does not consider the question of Planet's direct liability for consumer fraud, negligence, and civil conspiracy which Fermaint additionally alleges against Planet, discussed *infra*. These claims were apparently not at issue in *Jackson*.

## IV.    PLAINTIFF'S CLAIM FOR CONVERSION DOES NOT FAIL

Planet's first argument against Fermaint's conversion count is that Fermaint failed to serve PHL or MCS with a demand for his personal property. This is simply untrue. First, Fermaint's representative, Adeline Lewis demanded access to the property and notified both Planet and MCS

in writing of the illegal seizure of Fermaint's personal property. (Defendants' SOF Exhibit H, at Exhibit 10 (pp. 279)). In addition, On September 12, 2018 Adeline Lewis spoke with MCS's team leader about the illegality of their actions and to inform them that substantial personal property was taken.  Defendants' SOF Exhibit H at Exhibit 10 (*PageID # 2587*). Planet's own servicing notes reflect communications on behalf of Fermaint regarding the personal property as well. SOAF Exhibit U. How explicitly must a party request return of his property? Notifying both Planet and MCS that their agents had wrongfully taken Fermaint's personal property should be enough to meet the burden of requesting the property be returned. If Fermaint did not care about the property and did not want it back, he would not have complained of the wrongful conduct by Planet and its minions.

Further, it is clear that a formal legalistic demand for return of the property would have been futile. This is proven by the litigation positions taken by the Defendants in this case, i.e., they are not responsible for the conduct of any contractors and no one removed any personal property. "Where it appears that the defendant either before the action was instituted or upon the trial contests the plaintiff's rights upon the merits, or where it appears that a demand would have been of no avail, then none is required, for the law never requires the doing of a useless thing." *Carroll v. Curry*, 912 N.E.2d 272, 276, 332 Ill. Dec. 86, 90, 392 Ill.App.3d 511, 515 (Ill. App. 2 Dist.,2009). Additionally, "demand is unnecessary where another independent action of conversion is established." *Fortech, L.L.C. v. R.W. Dunteman Co., Inc*., 852 N.E.2d 451, 462, 304 Ill. Dec. 201, 212, 366 Ill.App.3d 804, 817 (Ill. App. 1 Dist.,2006)(Internal quotations and citations omitted). These cases stand for the proposition that demand is unnecessary where the Defendants' action show it would have been useless. That is clearly the case here.

Next Planet argues it never exercised control, dominion, or ownership over any of

Plaintiff's property. This is the argument made by Ocwen and Altisource in *Thakkar*. In other words, since Planet contends it cannot have any direct liability for MCS or its vendors, Planet cannot be liable for conversion. Planet's position completely ignores the theories of direct liability explained infra by Fermaint based upon the Restatement (Second) of Torts §§ 158(a) or §§875-877, as well as Fermaint's argument that agency principals can be applied based upon the agreements, understanding and industry practices implicated in the property preservation industry. Planet also ignores its knowledge that its order to undertake an initial secure of Fermaint's property would ultimately end with the removal of everything constituting personal property or debris from inside the home. This is because the FHA guidelines required the property be left in broom-swept condition. In other words, there is a direct causality flowing from Planet's secure order to the loss of Fermaint's property based upon Planet's illegal order to invade Fermaint's home in violation of law.

There is no break in the causality chain for an illegal act arising from an order to commit the illegal act. The defendants and their vendors are part of a conspiracy to engage in illegal violations of the IMFL *en masse*. Planet knows full well what the initial secure order entails. In fact, it is arguable that all parties involved in property preservation know full well the ultimate goal of the initial secure order is to remove everything from the property and dispossess all others from the property. This can be implied by reference to the requirements under the FHA Servicing Guidelines.

For instance, by reference back to <u>SOAF Exhibit V, pg. 656</u> provides the FHA definition of an occupancy inspection. This section only requires ongoing inspections if the initial inspection does not determine occupancy status. Page 657 sets out the steps to be taken if the property is determined to be vacant. Vacant Property Inspections are discussed at <u>SOAF Exhibit V, pages 659-670</u>. At 670, the FHA Handbook specifically states that a First-Time Vacancy Inspection is performed on the date

the mortgagee takes possession of a vacant or abandoned property. The hyperlink in that section transfers you to <u>SOAF Exhibit V, pgs. 757</u> discussing securing and maintaining the property. The most relevant portion of this section is found at <u>SOAF Exhibit V, pg. 761</u>. This directive requires Planet to "ensure that all interior and exterior debris is removed from the Property, including attics, basements, barns, storage spaces, and outbuildings, and that the Property is in Broom-swept Condition." The Guides define Broom-swept condition as "the condition of a Property that is, at a minimum, reasonably free of dust and dirt and free of hazardous materials or conditions, personal belongings, and interior and exterior debris." <u>SOAF Exhibit V, pg. 752</u>. Thus, it is a direct step to say that by virtue of Planet issuing an order for an initial secure, the end result of that process is the removal of all items of personal property from the consumer's home whether it be classified as personal property or "debris" by Planet and its vendors.

Planet finally attempts to argue that Fermaint conceded that the break-in must have happened prior to the initial secure. Whatever Fermaint may have said, he is personally unfamiliar with the operations of the property preservation industry. The pictures in this case, just like the pictures in *Thakkar,* do not exclude the condition of the property resulting from the conduct of contractors fulfilling Planet's orders. In fact, it is just as likely that the contractors sent to the property ransacked the property before they took photographs. We can infer this because we have the testimony that the home was not in this condition depicted in MCS's photographs when the home was turned over to the realtor Lozano, and Lozano testified the property was not in this condition when they last entered the property. *SOF Exhibit F, 70:4-23, 80:16-25, 81:12-18, 90:22 (PageID # 1683, 1693-1694, 1703)*. There was no evidence the home had been broken into prior to the removal of the realtor's lockbox by MCS's vendor, and only after MCS's vendors had been in the property did evidence arise that the home had been ransacked.

## V.      FERMAINT'S ICFA CLAIM DOES NOT FAIL.

Next, Planet argues that Fermaint's ICFA claim must fail because there is no evidence of any deceptive act or practice. This position can only be taken by ignoring the facts of this case and the law applicable to Planet's conduct. Planet's deceptive misconduct in this case is rampant and widespread. From Planet's failure to recognize its most basic obligations under Illinois law to ordering the invasion of Fermaint's home, Planet's conduct is both deceptive and unfair.

###### a.      *Fermaint Presents Abundant Evidence of Deceptive Acts or Practices*

Planet absolutely skirted the foreclosure process and engaged in self-help repossession of Fermaint's home. Planet ignored the obligations cited in Section II above that required Planet to service loans in default in accordance with all state and federal laws. Planet ignored their obligation under Illinois law to seek and obtain the permission of the foreclosure court before taking possession of Fermaint's home as required by the IMFL. SOAF ¶ 5-12.

Planet took the position that the mortgage authorized the initial secure of Fermaint's property. As set out above, by definition from the FHA Guides, this meant taking possession of Fermaint's home and dispossessing all others from the home. *See* SOAF Exhibit V, pg. 670. Planet fails to appreciate any difference between securing a property and inspecting a property from the exterior with invading a consumer's home and knowingly causing the theft or loss of the consumer's personal property. Planet also attempts to justify its conduct on the grounds that Fermaint provided a loss mitigation form related to the short sale that said the property was vacant. However, Planet conveniently ignores that it secured the home prior to receiving the form. Defendants' SOF, Exhibit H, 60:7-9 (PageID # 2369).

Planet also attempts to blame Fermaint for not calling Planet after the June letter regarding Planet's inspection. In the first instance, assuming this letter was mailed, it was not done so until

after Fermaint had notified Planet the home was listed for Short Sale. Secondly, Planet ignores its own failures to reach out to Fermaint's designated representatives or to even consult its own mortgage servicing notes to learn the property was in the process of Short Sale. Planet also ignores its own failings to abide by the applicable law and the FHA Guides by invading Fermaint's home during the Short Sale process. Planet claims it provided timely the access code to enter the property, but that fact is belied by both the Mortgage Servicing Notes and Adeline Lewis's testimony and written correspondence with Planet and MCS. Response to Defendants' SOF at ¶ 97.

Lastly, Planet argues that its entry onto the Property was expressly sanctioned by the Mortgage. Fermaint has extensively discussed this issue already. This position reflects Planet's expansive reading of the two sentences from Paragraph 5 as carte blanche to engage in whatever conduct it wishes without limitation. That position is unsupported in the law, as previously discussed in Section II above and incorporated here by reference. Planet can only make this argument by ignoring its obligations under Illinois law.

     b.    *There Is Substantial Evidence of Unfairness.*

Planet also argues Fermaint's unfairness claim fails. Clearly, this is not the case. In fact, the unfairness claim is easily the strongest claim between the two ICFA counts. This is because Planet clearly ignored their obligation to seek permission to take possession of the property from the foreclosure court as required by the IMFL. Planet then ordered an initial secure of Fermaint's property with full knowledge that process would result in the removal and disposal of all of Fermaint's personal property as well as a changing of the locks and dispossessing Fermaint from the property. As noted earlier, *Boyd, Bywater, Hill, Flippin, Obradovich,* and *Thakkar* have all found this very conduct actionable under the ICFA.

24

Planet also ignored the obligation to interpret its contractual rights under the mortgage in accordance with the limitations and procedures established by the IMFL and seek a court order prior to entering Fermaint's home. Additionally, Planet ignored the holdings in the *Boyd* line of authority set out above, expressly forbidding the very conduct that Planet engaged in to take possession of Fermaint's property. Planet trespassed upon Fermaint's property through its agents and sub-agents notwithstanding Paragraph 5 of the mortgage. This conduct offends Illinois' public policy as established by the IMFL and is actionable under the unfairness portion of the ICFA.

Also, even if the property was vacant, it was not vacant and unsecured. The Property was in the hands of a realtor and secured with a lockbox. Again, the burden of preserving and protecting the property was placed on Fermaint by the short sale process and Planet's obligations were temporarily abated by the FHA guidelines cited *supra*. Planet either did not know of the applicable FHA guidelines or ignored them. In either case, Planet can still be held to account for ICFA unfairness because any claimed ignorance of the law is no defense.

Since at least 2011, case law has been on record in this jurisdiction holding that an ICFA unfairness claim can arise from a mortgage servicer dispossessing a consumer of his property without notice or court approval. *See Boyd v. U.S. Bank, N.A.*, 787 F. Supp. 2d 747, 755 (N.D. Ill. 2011). *Boyd* also held "[d]efendants' actions offended public policy as embodied in the IMFL." [I]n residential real estate foreclosure actions, the presumptive right to possession during foreclosure rests with the mortgagor of the residential real estate."" *Id*. at 756. "The violation (knowing or unknowing) of other statutes, regulations, or legal rules does not automatically predicate an ICFA claim but can predicate a claim if the alleged misconduct is independently deceptive or unfair within the meaning of the ICFA." *Id*. at 755. Therefore, prior to the wrongful dispossession of Fermaint, Planet was imputed with knowledge by *Boyd* and a litany of similar

cases, that this conduct was unlawful and actionable in the State of Illinois. Planet does not seem to care what the law is on this point. Planet testified that it did not seek any court's permission to enter Fermaint's premises and has *never sought* any court's permission to enter any property in the State of Illinois at any time. SOAF ¶ 6.

Next, Planet tries to invoke *Schweihs v. Chase Home Fin., LLC*, 2015 IL App (1st) 140683, to support its position. *Schweihs* has no application to this case. In the first instance, Planet relies upon the Appellate Court of Illinois decision while ignoring the Supreme Court of Illinois's decision in *Schweihs* reported at 77 N.E. 3d 50. As this Court is well aware, the explicit holding of *Schweihs* dealt only with IIED and NIED claims. Planet ignores the fact that the trial court denied Chase Home Finance's motion for summary judgment on Schweihs' trespass and ICFA claims. *Id*. at 56. Planet also fails to discuss multiple federal cases that have already distinguished and limited *Schweihs* and its holding to claims of IIED and NIED. See *Sifuentes v. Rushmore Loan Mgmt. Servs., LLC*, 2018 U.S. Dist. LEXIS 48813, at *12 (N.D. Ill. Mar. 26, 2018) (collecting cases holding this conduct violates ICFA and distinguishing *Schweihs* as addressing IIED claims). *Fressola v. Safeguard Props., LLC*, 2017 U.S. Dist. LEXIS 125237, at *17 (N.D. Ill. Aug. 2, 2017)(Denying motion to dismiss by distinguishing *Schweihs* on grounds that defendants' conduct could be found not reasonable or appropriate under the contract).

Planet's argument that Fermaint's allegations regarding Planet's intent is not correct and requires no response. A jury will have the opportunity to evaluate Planet's conduct and state of mind. Despite Planet's protestations, this case is factually similar to *Obradovich, Bywater* and *Hill*. In fact, Planet ignores its own processes and FHA Guides when making this argument. As shown *supra*, Planet knowingly issued an order that led to the trespass of Fermaint's property, his dispossession, and the loss of personal property within the home. Worse yet, Planet did this for

absolutely no reason. Fermaint's property was in the process of Short Sale and none of Planet's actions were necessary or required. Further, Planet undertook this conduct by flouting its obligations to comply with the IMFL.

        c.     *The Defendants' Conduct Clearly Implicates Punitive Damages.*

Planet next argues that the Court may determine that punitive damages are not warranted as a matter of law based upon its presentation of the facts and arguments in its motion. First, "[w]hether punitive damages can be awarded for a particular cause of action is a matter of law, but the question of whether a defendant's conduct was sufficiently willful or wanton to justify imposing punitive damages is generally for the jury to decide." *Barton v. Chi. & N. W. Transp. Co.*, 757 N.E.2d 533, 555 (Ill. App. 1st Dist. 2001). The threshold question then is whether a cause of action allows for a punitive damages award.

Applicable here, Illinois law permits the imposition of punitive damages in appropriate circumstances for violations of ICFA, trespass, conversion, and civil conspiracy. "Generally, punitive damages are awarded when the underlying tort is accompanied by aggravating circumstances such as willful, wanton, malicious, or oppressive conduct." *City of Evanston v. Texaco, Inc.*, 19 F. Supp. 3d 817, 828 (N.D. Ill. 2014); or "when torts are committed with fraud, actual malice, . . . or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." *Cirrincione v. Johnson,* 184 Ill. 2d 109, 115-16, 703 N.E.2d 67, 70, 234 Ill. Dec. 455 (1998); *Smith v. Prime Cable of Chicago,* 276 Ill. App. 3d 843, 858, 658 N.E.2d 1325, 1336, 213 Ill. Dec. 304 (1995) (ICFA case)." *Styx v. Wells Fargo Bank, N.A.*, No. 09 C 5960, 2010 U.S. Dist. LEXIS 28535, at *15-16 (N.D. Ill. Mar. 24, 2010). "Punitive damages may be awarded for violations of the Illinois Consumer Fraud Act based on unfair conduct in cases where the defendant acts maliciously or with deliberate

indifference. *Wendorf v. Landers*, 755 F. Supp. 2d 972, 981 (N.D. Ill. 2010)." *Hammer v. RCS, Inc.*, 2015 U.S. Dist. LEXIS 162636, *75 (N.D. Ill. 2015). Punitive damages are available for intentional trespass. *First Nat'l Bank v. Amco Eng'g Co.*, 335 N.E.2d 591, 594 (Ill. 1975). Punitive damages may also be recovered for a willful and wanton trespass. *Rodrian v. Seiber*, 551 N.E.2d 772, 775 (Ill. App. 1990). Punitive damages are available for a claim of conversion. *Cirrincione v. Johnson*, 184 Ill. 2d 109 (Ill. 1998). The case of *Sarno v. Thermen*, 608 N.E.2d 11 (1992) authorizes the recovery of punitive damages for civil conspiracy. Fermaint clearly has pled claims that could subject the Defendants to an award of punitive damages.

Planet argues that there is no evidence from which a reasonable jury could conclude that its conduct rose to the level of wrongdoing where punitive damages would be appropriate. This simply ignores the facts and evidence in this case. Planet knowingly ignored its legal obligations under the IMFL to take possession of Fermaint's home. SOAF ¶ 9. Planet did this knowing that its orders would trigger MCS and its vendors to trespass Fermaint's home. SOAF ¶ 17. Planet also knew its order would lead to the loss of all Fermaint's personal property located in his home. *See* SOAF Exhibit V, pg. 761. Planet engaged in this conduct despite having knowledge that this conduct was illegal. Planet has admitted that it has never sought any court's permission in Illinois prior to invading consumer's homes and dispossessing them of their home and personal property. SOAF ¶ 6. Planet has admitted acting in knowing violation and contempt for the law. SOAF ¶ 8-9. Despite Planet's attempts to gloss over its conduct as harmless and inconsequential, Planet has proven to be a lawless and reckless bad actor openly flaunting the law applicable to its conduct. This behavior demonstrates reckless indifference to the rights of others and Planet's own obligations under the law. Planet issued the orders which triggered the unlawful conduct in this case. Planet cannot issue an order that it knows will trigger illegal actions against Fermaint by its

vendors and co-conspirators and then deny its responsibility for the illegality.

Planet's conduct in this instance is outrageous. Planet admits that it ignores the requirements of Illinois law and orders its coconspirators to invade the residential real estate of consumers throughout the State of Illinois in direct contravention of Illinois law. SOAF ¶ 8. Planet admits its knowledge that these orders will result in Illinois consumers being locked out of their homes. SOAF ¶ 17. Planet also knows that every initial secure order it issues is intended to end with the consumer's home emptied of all personal property. SOAF Exhibit V, pg. 761. A reasonable jury could infer from the evidence that Planet undertakes this conduct intentionally to expedite the foreclosure process through self-help, to circumvent the applicable law, and to profit from expedited foreclosures. A reasonable jury could find Planet takes possession of consumer's homes to bully, intimidate and buffalo consumers to abandon their homes and their legal possessory rights to their homes and personal property. A more outrageous, malicious, and harmful scheme would be hard to concoct. A scheme that constitutes a bigger affront to the public policy of the IMFL would also be hard to conjure. Planet's conduct is certainly so egregious that the question of punitive damages should proceed to the jury for consideration.

## VI.    FERMAINT'S NEGLIGENCE CLAIM DOES NOT FAIL.

Planet argues Fermaint's negligence claim fails because there was no duty and Fermaint was not damaged. As has been shown, neither premise is correct. "Federal law treats the question whether a duty exists as an issue of law to be decided by a judge." *Reynolds v. Henderson & Lyman*, 903 F.3d 693, 697 (7th Cir. 2018). "The four factors courts typically consider in determining whether a duty exists are: (1) the reasonable foreseeability of injury; (2) the likelihood of injury; (3) the magnitude of the burden of guarding against injury; and (4) the consequences of placing that burden on the defendant." *Dunn v. Menard, Inc.*, 880 F.3d 899, 906

(7th Cir. 2018).

This Court has previously addressed the question of whether a duty exists in this very scenario in *Thakkar,* holding "all people or entities owe "a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonably probable and foreseeable consequence of an act, and such a duty does not depend upon contract, privity of interest or the proximity of relationship, but extends to remote and unknown persons." *Simpkins v. CSX Transp., Inc.*, 2012 IL 110662 ¶ 19, 965 N.E.2d 1092, 1097 (citations and internal quotations omitted). *Thakkar v. Ocwen Loan Servicing, LLC*, 2019 WL 2161544, at *10 (N.D. Ill., 2019). Just like in *Thakkar,* Fermaint alleges that Planet's own actions in entering an illegal initial secure order were the proximate cause of Fermaint's damages. As this Court wrote in *Thakkar*: "A jury could fairly determine that these injuries were proximately caused by Ocwen's order to secure the property. Once the order was issued it became clear that, at a minimum, the entries and the changing of locks would follow." *Id.,* *11. Fermaint's evidence goes farther than Thakkar's by proving that Planet knew the intended purpose of the initial secure order is the dispossession of all others from the property and the removal of all personal property form the home. Knowing the effects of the initial secure order, Planet had a duty to comply with the law embodied in the IMFL before ordering the dispossession of Fermaint and the destruction and loss of his property.

Planet argues the evidence shows that the property was ransacked prior to Planet's initial secure order. However, as explained earlier in Section I(b) this is simply not the case. There is no evidence an intervening illegal act broke the chain of causation. The evidence is that Fermaint's home was secured when the realtor's lockbox was placed on the home and remained that way until Planet caused the lock box to be cut off. Only after Planet's order triggered entry into Fermaint's home did the circumstances change inside the home. Given that one purpose of the initial secure

order was to remove all personal property from the consumer's home, a reasonable jury could conclude that the home was ransacked by those carrying out Planet's illegal order prior to taking the photographs Planet relies upon for its position. Planet's order to invade Fermaint's home was the catalyst illegal act; each act that followed was simply in furtherance of carrying out Planet's illegal order. Planet knew its order called for illegal acts when Planet ordered the invasion of Fermaint's home. It was foreseeable that illegal conduct would occur during the "securing" of Fermaint's premises since the very act of securing the premises without a court order was itself illegal.

## VII.   PHL IS A DEBT COLLECTOR

Planet seek summary judgment on Plaintiff's FDCPA claims under the premise that it is not a debt collector under the law.  This analysis will require this Court to have a more complete understanding of the context of Planet's business activities.  Planet attempts to evade the purview of the FDCPA but ends up squarely within it.  To summarize Planet's arguments, Planet claims its principal business is not debt collection, it does not collect debts on behalf of others and collected this debt on its own behalf as "owner" of the Fermaint loan.

### a.   *PHL satisfies The Principal Purpose Test.*

Section 1692a(6) of the FDCPA provides that a debt collector is any person who uses instrumentalities of interstate commerce in any business whose primary purpose is the collection of debts or a person who regularly collects debt owed to another. 15 U.S.C. §1692a(6) (2010). Indeed, a person who *regularly* purchases debts for the purpose of collecting for itself is not considered a debt collector. *Henson v. Santander Consumer USA, Inc.*, 137 S. Ct. 1718, 1721 (2017).  A "debt" under the FDCPA is limited to consumer obligations to pay debts for "personal, family or household purposes." 15 U.S.C. §1692a(5).

Planet rests its arguments on the recent Supreme Court case of *Henson v. Santander*

31

*Consumer USA, Inc.* Reliance upon *Henson* is misguided. In *Henson* it was not disputed that Santander regularly purchased delinquent debts for collection to collect for its own account. *Henson v. Santander Consumer USA, Inc.*, 137 S. Ct. at 1721. The Supreme Court only addressed a narrow issue; namely, whether the term "owed" in the definition of debt collector under 1692a(6) means one who purchases debt which is seeks to collect for itself. *Id.* Justice Gorsuch surgically isolated this issue from the rest of the statutory definition and pointed out the Supreme Court did not set out to answer whether an entity who also regularly acts as a third-party debt collector and collects defaulted debt for itself is a debt collector. *Id.* Similarly, the principal purpose portion of 1692a(6) was never answered in *Henson* because it was not raised in "[Henson's] petition for certiorari and neither did [the Supreme Court] agree to review it." *Id.* Thus, Planet attempts to ask this Court to extend *Henson* to issues far beyond that which it decided.

Planet describes its debt collection activities in its Rule 56.1 Statement by conceding that its principal business is "servicing loans," "payment processing," and "collecting and making disbursements for tax and insurance payments." Defendants' SOF Exhibit D ¶ 4. Notably, loan origination is not listed as one of Planet's business activities. *Id.* One need not struggle to discern from Planet's affidavit or the general function of loan servicing to deduce that Planet engages in debt collection. *Id.* Considering no other real business outside of debt collection is mentioned, an inference exists that Planet's principal business is the collection of debts. Fermaint's loan is an FHA residential loan for his primary residence. Defendants' SOF Exhibit A, 77:2 and 114. Planet clearly collects the kinds of debts that FDCPA is designed to regulate and cannot be said to not be a debt collector as a matter of law.

Planet offers one conclusory statement to get around the principal purpose definition and that is that 6% of its debts are defaulted debts at the time of acquisition by Planet. Defendants'

SOF Exhibit D ¶ 4.  This red herring data point is a naked attempt to draw focus away from the fact that 100% of Planet's business is the collection of debts, but only 6% of those debts are in default at any given moment.  Plus, unlike *Henson*, Planet does not plead it regularly collects defaulted debts for itself and not others.  Therefore, Planet effectively concedes its principal business is debt collection but argues because it purchased this particular debt for itself it cannot be considered a debt collector.

    b.    *Questions Of Fact Remain As To Whether Planet Is Collecting Fermaint's Debt For Another.*

Bancforest Mortgage originated the loan at issued in 2007. Defendants' SOF ¶ 6.  After a few servicing transfers, Planet became the loan servicer.  At the time Planet acquired the servicing rights to the loan it was in default. SOF ¶ 9; SOAF Exhibit T.   In Planet's affidavit used in the Fermaint foreclosure case, the affiant discloses nothing more than "servicing rights" which were acquired by Planet. SOAF Exhibit T. The affidavit contains a series of servicing records.  Those records identify "Ginnie Mae II" as the investor for Fermaint's loan. *Id.* at Bates 1262.  Defendant's affiant in support of summary judgment in this case states Planet owns the debt. Defendants' SOF at ¶ 10 and Defendants' SOF Exhibit D at ¶ 7.  However, the affiant does not provide any other facts establishing its ownership. These two inconsistent affidavits render Planet's position internally contradictory thereby preventing summary judgment. *See Rock Island Bank v. Aetna Casualty and Surety Company*, 706 F.2d 219 (7th Cir. 1983) (holding summary judgment should be denied where testimony could reasonably lead to different inferences).  The two affidavits create an issue of fact on their face as to Planet's actual rights in the Fermaint loan.

Questions of fact are abounding as to whether and to what extent Planet regularly collects debts on behalf of others.  Also, whether and to what extent Planet's defaulted debt are owned by Planet or a third party.  *Schlosser v. Fairbanks Capital Corp.* stands for the proposition that a

mortgage servicer who acquires a mortgage loan either in default, or wrongly believed to be in default, is subject to the requirements of the FDCPA. 323 F.3d 534, 547 (7th Cir. 2003). *Schlosser* remains good law and renders Planet a debt collector under the FDCPA. Planet's affidavit does not resolve this issue as a matter of law.

## VIII. FERMAINT'S §1692f(6) FDCPA CLAIM DOES NOT FAIL.

Section 1692f(6) prohibits debt collectors from taken nonjudicial actions to dispossess or disable property if there is no present right to possession of the property through an enforceable security interest. 15 U.S.C. §1692f(6)(A). Fermaint's home was in foreclosure at all times during the events giving rise to this case. Illinois is a lien theory jurisdiction whereby the conveyance of a mortgage and assignment of rents grants a mortgagee a lien upon the real estate and rents, not actual title. *See Harms v. Sprague*, 119 Ill. App. 3d 503, 507 (4th Dist. 1983). The mortgage thus represents a remedy for the debt and not title to property. *Id* at 508. The IMFL is the exclusive mode of procedure during a foreclosure. 735 ILCS. 5/15-1107.

Possession is governed under Section 1701 *et seq*. Section 1701(a) makes clear that possession under the statute includes "physical possession" and states that real estate is "residential real estate only if it is residential real estate at the time the foreclosure is commenced." Residential real estate is defined in the IMFL to include a single-family home that is occupied by the mortgagor, the mortgagor's spouse or the mortgagor's descendants. 735 ILCS 5/15-1219 (2013). The foreclosure case commenced in May of 2017 and Fermaint resided in the home through September 2017 and maintained a presence thereafter through 2018 until the locks were unlawfully changed by the defendants. Defendants' SOF Exhibit E at 57:24-58:13 (*PageID # 1456-1457*). Therefore, Fermaint's home meets the definition of residential real estate under the IMFL since that status is determined at the time the foreclosure is filed. 735 ILCS 5/15-1701(a).

A mortgagee like Planet can be placed in possession of residential real estate pre-judgment by

establishing grounds pursuant to 735 ILCS 5/15-1701(b)(1).  This requires the mortgagee request and obtain an order of possession from the foreclosure court.  It is not disputed that Planet failed to make such a request or obtain a court order. SOAF at ¶ 5-9. Consequently, Planet had no right to take possession, change locks or order entry into Fermaint's home, *regardless of any provision of the mortgage*.

As Fermaint has established, Planet had absolutely no legal right to enter the premises. Planet's expansive reading of its rights under Paragraph 5 bely the limitations imposed by Illinois law. Planet's argument that Paragraph 5 of the mortgage trumps the IMFL is expressly contradicted by 735 ILCS § 5/15-1701(f). Planet's illegal initial secure order was intended to dispossess Fermaint and to cause the loss of his personal property remaining within the home. Further, Planet took this action in spite of the FHA guidelines that dictated Planet stand down while Fermaint was in the Short Sale process. Planet's attempts to argue otherwise are unavailing.

## IX.     THE BREACH OF CONTRACT CLAIM DOES NOT FAIL.

Planet makes two attacks on the contract claim. First, that Planet did not breach the mortgage by ordering the initial secure and second that Fermaint's default relieves Planet of any obligations of performance. Both positions are legally wrong. The IMFL controls Planet's right to take possession of Fermaint's property. Whether or not a payment default existed at the time of Planet's order to invade Fermaint's home is irrelevant. Section II above provides all the arguments needed to dispose of Defendants' arguments and Fermaint incorporates them by reference rather than repeating them.

## X.      THE CIVIL CONSPIRACY CLAIM DOES NOT FAIL.

Planet's final attack is upon Fermaint's conspiracy count. After reciting a string cite of cases that have no bearing on the issues here, Planet posits that the conspiracy count fails because (1) there is no evidence of unlawful purpose or lawful purpose by unlawful means; (2) no evidence

of any overreaching agreement to commit unlawful acts; (3) and no unlawful activity. Planet attempts to distinguish this Court's ruling in *Thakkar* by arguing that there are no questions of fact as to whether or not one or more defendants committed tortious acts. Planet again asserts taking possession of Fermaint's home was not illegal because the home was vacant and lastly argues that the count should fail because it is duplicative of Fermaint's other claims. Each of these positions are wrong.

The elements of a civil conspiracy are (1) a combination of two or more persons; (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means; (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act. *Vulcan Golf, LLC v. Google, Inc.,* 552 F. Supp. 2d 752, 782 (N.D. Ill. 2008).

Satisfying the first element, Planet concedes that there are two or more persons involved in the provision of property preservation services. *See,* SOF ¶ 25, 34. Satisfying the second element, Planet admits ordering the invasion of consumer's homes without considering or complying with the IMFL, and without obtaining any court's permission to take possession of residential real estate. SOAF ¶ 5-9. As stated earlier, 735 ILCS 5/15–1701(b) requires a mortgage servicer to object to the Mortgagor's continued possession of the property and obtain a court order granting possession during foreclosure. Engaging in self-help is illegal. See *Boyd,* supra. Planet, though having a legal right to contract for property preservation services, has utilized illegal means to gain possession of Fermaint's home through its relationships with its co-conspirators. This fact pattern classically fits the definition of "accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means." Satisfying the third element, Planet ordered the illegal initial secure which led to the illegal dispossession of Fermaint

36

and the loss of his personal property. Planet knew the intended outcome of the initial secure. Planet's actions triggered a trespass against Fermaint's residence by Planet's co-conspirators. Just like in *Thakkar* the facts in this case demonstrate that these actions "clearly contemplates a scheme in which the defendants knowingly take part in a contractual scheme intended to force homeowners out of their homes without judicial process."

*Thakkar v. Ocwen Loan Servicing, LLC*, 2019 WL 2161544, at *14 (N.D. Ill., 2019).

In this case, the evidence shows that both Planet and MCS refuse to comply with the IMFL in the conduct of their property preservation efforts. MCS retains persons to physically go to the property and carry out Planet's illegal orders. However, MCS imposes upon them an obligation to do what is commanded without question or forgo compensation for their time and efforts. SOAF at ¶ 22-26.

A reasonable jury could find the manner in which the FSA and VSA are operationalized between Planet and MCS and MCS's vendors is intended to create an appearance that Planet is remote from this illegal conduct. However, in actuality, Planet's orders to commit the illegal acts are the catalyst of the entire scheme. The FSA and VSA serve as an attempt to insulate Planet and MCS from liability by putting forth their patsies in the form of the local contractors to go and do Planet and MCS's illegal bidding.

Since both Planet and MCS acknowledge ignoring the requirements of the IMFL before taking possession of residential real estate in foreclosure, their provision of property preservation services is clearly illegal. The question simply becomes whether they commit any torts in the process of this illegal undertaking. Fermaint has provided substantial evidence showing that this conduct constitutes a violation of the ICFA, a trespass, and a conversion of Fermaint's personal property. "To be liable as a conspirator you must be a voluntary participant in a common venture,

although you need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are. It is enough if you understand the general objectives of the scheme, accept them, and agree, *either explicitly or implicitly*, to do your part to further them." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988) (emphasis added). MCS and Planet voluntarily participate in this scheme, both understand and accept the general objectives and have express written contracts agreeing to do their part to further them. MCS and Planet are both liable as conspirators in this scheme.

Lastly, the conspiracy claim is not duplicative. Rather, the conspiracy count is an active safety net for the Plaintiff providing an additional path to impose liability upon Planet and MCS for the acts of the contractors who entered Fermaint's property at their behest. Further, once the conspiracy is formed, all of its members are liable for injuries caused by any unlawful acts performed pursuant to and in furtherance of the conspiracy." *Lewis v. Lead Industries Association,* 2020 IL 124107, ¶ 20, 2020 WL 2562929, at *4 (Ill., 2020) (internal citations and quotations omitted). As *Lewis* makes clear, the conspiracy count insulates Fermaint against any efforts by Planet and MCS to blame the contractors who entered Fermaint's property for wrongdoing as a vehicle to escape liability themselves. Thus, this count is not duplicative as argued by Planet and should be allowed to go to the jury for consideration.

## CONCLUSION

As this response demonstrates, Planet and MCS's motion is due to be denied in all respects. Fermaint requests entry of such an order.

**Dated**: February 11, 2021

Respectfully submitted,

Attorneys for Plaintiff EVAN FERMAINT:

*/s/ Nick Wooten*
Nicholas Heath Wooten
Nick Wooten, LLC
4935 Bay Hill Drive
Conway, AR 72034
nick@nickwooten.com

## CERTIFICATE OF SERVICE

The undersigned certifies that on **February 11 , 2021** a true and correct copy of the foregoing **Plaintiff's Response in Opposition to Planet and MCS's Motion for Summary Judgment** was served upon all counsel of record for the Defendants via electronic filing:

*/s/ Nick Wooten*
Nicholas Heath Wooten
Nick Wooten, LLC