## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

EVAN FERMAINT,              )

                    )

        Plaintiff,      )     No. 18 C 07325

                    )

        v.            )     Judge John J. Tharp, Jr.

                    )

PLANET HOME LENDING, LLC and   )

MORTGAGE CONTRACTING     )

SERVICES, LLC,          )

                    )

        Defendants.     )

### MEMORANDUM OPINION AND ORDER

Plaintiff Evan Fermaint brings this lawsuit to recover damages he suffered after Planet Home Lending, LLC ("Planet"), which owned Fermaint's home mortgage loan, and Mortgage Contracting Services, LLC ("MCS") (collectively, the "Defendants") allegedly broke into his home without authorization, changed the locks, stole his belongings, and damaged his real property. First Amended Complaint ("FAC"), ECF No. 128 ¶¶ 1-3. Fermaint asserts that by filing a foreclosure complaint against him, and subsequently changing the locks on his property and ransacking it without obtaining an order of possession from the foreclosure court, the Defendants violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq*. ("FDCPA"), the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq*. ("ICFA"), and Illinois common law. FAC at 10-22 (bringing state law claims for trespass to real property and chattels, conversion, negligence, breach of contract, and civil conspiracy). The Defendants move for summary judgment on all claims pursuant to Federal Rule of Civil Procedure 56, arguing primarily that they took reasonable, and lawful, action to protect and preserve the property pursuant to the terms of the mortgage contract. MCS Mot. Summ. J., ECF No. 156; Planet Mot.

Summ. J., ECF No. 159. For the following reasons, the motions are granted in part and denied in part.

## FACTUAL BACKGROUND

This background section includes material facts taken from the Defendants' Joint Statement of Facts, ECF No. 158 ("SOF"); Fermaint's Response to the Joint Statement of Facts, ECF No. 165 ("SOF Resp."); Fermaint's Statement of Additional Facts, ECF No. 166 ("SOAF"); and the Defendants' Joint Reply to the Statement of Additional Facts, ECF No. 171 ("SOAF Reply"). All facts are undisputed unless otherwise noted. The Court construes all properly supported facts and draws all reasonable inferences in the light most favorable to Fermaint, the non-moving party. *See, e.g.*, *Foley v. City of Lafayette,* 359 F.3d 925, 928 (7th Cir. 2004).

In constructing this factual background, the Court applies the requirements of Local Rule 56.1. *Hanover Ins. Co. v. House Call Physicians of Ill.*, No. 15 C 3684, 2016 WL 1588507, at *2 (N.D. Ill. Apr. 19, 2016) ("[T]he Seventh Circuit repeatedly has held that the district court is within its discretion to enforce strict compliance with the requirements of Local Rule 56.1.") (collecting cases). For example, where a party explicitly disputes an asserted fact, but that "proposed statement of fact is supported by the record and not adequately controverted by the opposing party, the Court will accept that statement as true." *Hartford Fire Ins. Co. v. Taylor*, 903 F. Supp. 2d 623, 647 (N.D. Ill. 2012) ("To adequately dispute a statement of fact, the opposing party must cite specific support in the record; an unsubstantiated denial or a denial that is mere argument or conjecture is not sufficient to create a genuinely disputed issue of material fact."). "[D]istrict courts are not required to 'wade through improper denials and legal argument in search of a genuinely disputed fact.'" *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015) (internal citation omitted). Therefore, to the extent that the Local Rule 56.1 submissions include legal arguments or fail to provide admissible evidence that tends to prove or disprove a proffered fact, the Court

disregards those submissions.[1] *See Minn. Life Ins. Co. v. Kagan*, 847 F. Supp. 2d 1088, 1093 (N.D. Ill. 2012). But where assertions, even unsupported, are not disputed, "the Court treats them as though they are admissions for purposes of Fed. R. Civ. P. 56(c)(1)(A)." *Jackson v. Bank of New York*, 62 F. Supp. 3d 802, 807 (N.D. Ill. 2014) ("[J]ust as the Court has the discretion to require strict compliance with the local rules, so too is it vested with the discretion to overlook transgressions of the local rules so long as it enforces or relaxes the rules equally as between the parties.") (citing *Modrowski v. Pigatto,* 712 F.3d 1166, 1169 (7th Cir. 2013)).

## I.    The Defendants' Property Preservation Services and Practices

Planet's principal business is servicing mortgage loans, though it also engages in collection efforts. Loan servicing includes payment processing, maintaining records of payments and balances, collecting and making disbursements for tax and insurance payments, sending monthly

---

[1] For example, Fermaint asserts in his statement of additional facts that Planet "testified that it . . . has never sought any court's permission to enter any property in the State of Illinois at any time." SOAF ¶ 6 (citing SOF Exhibit A, ECF No. 158-1 at 106:1-107:3). But the cited deposition testimony reveals that upon being asked, "Do you know if Planet has ever sought any court's permission to enter and secure a property in foreclosure in Illinois?", the declarant answered, "I just don't have that information to answer that question." SOF Exh. A at 106:5-8. The evidence therefore does not support Fermaint's assertion, so the Court disregards it.

The Defendants are also guilty of such practices. For example, they assert that all work orders issued by MCS to its subcontractors give the subcontractors flexibility in the timeline to complete the order, citing to SOF "Exhibit G at Exhibit 19" and "Exhibit 18." SOAF Reply ¶ 28. SOF Exhibit G, however, does not contain any Exhibit 18 or Exhibit 19; instead, the document skips from Exhibit 16 to Exhibit 22. SOF Exh. G, ECF No. 158-7 at 455-461. Along the same lines, because the Defendants cite to the non-existent "Exhibit G at Exhibit 21 p. 10," the Court cannot accept their proffered fact that "FTP did not remove any items of personal property or debris from the Property or touch the water meter." SOF Resp. ¶ 65.

"The purpose of Rule 56.1 is to have the litigants present to the district court a clear, concise list of material facts that are central to the summary judgment determination." *Curtis*, 807 F.3d at 219. The parties have fallen well short of that objective and instead have made the task of identifying undisputed facts much more difficult.

statements, and providing customer service. SOF Resp. ¶¶ 2-3. A little over six percent of the loans Planet services are in default at any one time. SOF Resp. ¶ 4.

MCS is a property preservation contractor that provides inspection and other services to lenders and mortgage servicers nationwide, including Planet. MCS typically provides services regarding vacant and abandoned property, including occupancy inspections, winterizing, changing locks, securing, and performing other authorized work. MCS will typically engage local subcontractors, also called vendors, to carry out these tasks. When making a vacancy determination, the vendors do not merely perform drive-by inspections, but are supposed to visually inspect the full property, including multiple sides, and record what they see to make an occupancy determination. SOF Resp. ¶ 51. One vendor testified that in his experience, when executing work orders, he has found people in possession of the property approximately 20 percent of the time. SOAF Reply ¶ 35.

## II. Fermaint's Mortgage Loan and Move to Willow Springs

On November 19, 2007, Fermaint provided a mortgage (the "Mortgage") to obtain a loan; the loan was secured by real property commonly known as 7838 W. 73rd Pl., Bridgeview, Illinois (the "Property"). The Mortgage provided that, "Lender may inspect the Property if the Property is vacant or abandoned or the loan is in default. Lender may take reasonable action to protect and preserve such vacant or abandoned Property." SOF Resp. ¶ 7. Section 17 of the Mortgage ("Assignment of Rents") also permits the Lender to "enter upon, take control of or maintain the Property" in the event of any "breach." SOF Exh. B, ECF No. 158-2 at 16-22. Fermaint defaulted on the loan as of November 1, 2015, and remained in default thereafter. SOF Resp. ¶ 9.

On February 2, 2016, Planet purchased the loan and began servicing it. On May 26, 2017, Planet commenced foreclosure proceedings on the Property in the Circuit Court of Cook County.

SOF Resp. ¶ 10-11. In October 2017, during the foreclosure proceedings, Fermaint moved out of the Property to a house located in Willow Springs, Illinois (the "Willow Springs Residence") with his then girlfriend, his mother, and his children. SOF Resp. ¶ 12. When he moved out, Fermaint left behind various pieces of personal property, including a bed, an entertainment center, a refrigerator, a dining room table, and items in the garage and an outdoor shed. Fermaint claims he left other personal property there as well, including dirt bikes, a television, a sleeper sofa, free weights, cookware, sports cards, personal photographs, and various pieces of gold and silver jewelry.

After October 2017, although Fermaint and his son visited the Property from time to time, no one stayed overnight or slept at the Property, and no one lived there through the date the Property was sold in December 2018. SOF Resp. ¶ 15. Fermaint testified that he continued to maintain the Property after October 2017, visiting it "six times" for "between 5 to 10 minutes." SOF Exh. E, ECF No. 158-5 at 62:2-11.

On June 4, 2018, Fermaint listed the Property for sale with his realtor, Ana Lozano, and advised Planet that he intended to short sell[2] the Property. SOF Resp. ¶ 17. Lozano did not place a for-sale sign in front of the Property while it was listed but did place a lockbox on the front door. SOAF Reply ¶ 13. The lockbox was observed and photographed by MCS's vendors during the inspections of the Property on June 12, 2018 and August 27, 2018, before it was removed and replaced with a different lockbox by MCS's Vendor, FTP Investments, LLC ("FTP"), on August 31, 2018. SOAF Reply. ¶ 13.

---

[2] "Short selling" a property means selling it for less money than is due on the loan.

### III.     The Defendants' Occupancy Inspections

The Defendants state that between June and August 2018, they conducted occupancy inspections that revealed and confirmed that the Property was vacant, leading to their authorization of an "Initial Secure" that took place on August 31, 2018. Fermaint maintains that the "Initial Secure" was not based upon legitimate vacancy determinations. *See* SOAF Exh. Q, ECF No. 166-8 (MCS Inspection Reports January 2017 through May 2018). The Court reviews the relevant facts below.

#### A.  June 12, 2018 Inspection and Vacancy Posting

On June 6, 2018, upon Planet's authorization, MCS assigned a local vendor to perform an occupancy inspection at the Property, and an occupancy inspection was performed on June 12, 2018. SOF Resp. ¶ 53. The Defendants assert that MCS's vendor determined that the Property was vacant because the electrical service was turned off and the Property was "not maintained." SOF Resp. ¶ 54; *see* SOF Exh. G at Exh. 16 (inspection report states that electrical meter shows electricity off and that the property is not maintained). Fermaint, however, disputes this fact, asserting that it is not supported by sufficient evidence and arguing that the evidence shows the electrical service remained on after June 12. SOF Resp. ¶ 54 (arguing that the relevant document is inadmissible hearsay[3], and the documentary evidence is contradicted by other MCS

---

[3] Hearsay is inadmissible on summary judgment to the same extent that it is inadmissible at trial. *See Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). The proponent of hearsay bears the burden of establishing that the statement is admissible. *Hartford Fire Ins. Co. v. Taylor*, 903 F. Supp. 2d 623, 640 (N.D. Ill. 2012)

documentation, including photographs showing the Property's lights on and testimony about subsequent use of power at the Property).

On June 12, 2018, MCS's vendor posted a notification on the front door of the Property stating that the Property had been determined to be vacant and if the Property was not vacant, MCS should be contacted immediately. SOF Resp. ¶ 55.

### B. Alleged Text Message from Fermaint's Nephew and First Secure Work Order

The Defendants, citing to a cell phone screenshot, maintain that Fermaint was aware that the Property was determined to be vacant or abandoned as early as June 13, 2018, when his nephew sent him a photograph of the front-door vacancy notification via text message. SOF Resp. ¶ 56 (citing SOF Exh. I, ECF No. 158-9). Fermaint disputes this fact, asserting that the screenshot is insufficient evidence to establish that he knew of the vacancy notice (though he does not explain why). He also contends, inconsistently, that he posted a notice on the front door indicating that the Property was *not* abandoned—something he would have no need to do had he not learned of the vacancy notification posted on the door. SOF Resp. ¶ 56.

### C. The Defendants' Alleged June 18, 2018 Vacancy Letter to Fermaint

Work orders issued by the Defendants after June 12, 2018 indicate a First-Time Vacant ("FTV") date of June 12, 2018, and on June 14, 2018, MCS assigned a work order instructing a vendor to secure the Property. SOAF Reply ¶ 37.

The Defendants assert that Planet sent a letter to Fermaint at the Property on June 18, 2018, informing Fermaint that (1) a recent inspection of the Property revealed it to be vacant or abandoned, (2) Planet would act to secure and winterize it, and (3) he should contact Planet immediately if the Property was not vacant or abandoned. SOF Resp. ¶¶ 19-22. Fermaint disputes that the letter was ever mailed because: (1) he did not receive it, (2) the Defendants' declarant did

not have personal knowledge that the letter was sent, and (3) the attached letter does not include a certified mail number or return receipt. SOF Resp. ¶ 19. The Defendants insist that the letter was forwarded to the Willow Springs Residence and that Fermaint's girlfriend, Saskia Benitez, signed a receipt for the letter. SOF Resp. ¶ 22 (citing to a United States Postal Service receipt from June 25, 2018 containing a signature appearing to be that of Ms. Benitez). Fermaint, however, disputes that the evidence is dispositive because (1) Fermaint does not recognize the signature, (2) nothing else connects the receipt to the alleged letter, and (3) the Defendants do not explain why the letter, which was allegedly addressed to the Property, would be forwarded by certified mail to the Willow Springs Residence. SOF Resp. ¶¶ 19-22.

### D. Fermaint's Encounter with Timothy Stokes, an MCS Vendor, on June 20, 2018

On June 20, 2018, an MCS vendor, Timothy Stokes, came to the Property. Inconsistently with their contention that the FTV determination had been made on June 12, and the work order MCS issued on June 14 to secure the Property, the Defendants assert that Stokes was there "to determine whether the property was vacant or occupied." SOAF Reply ¶ 2. Fermaint asserts that Stokes was there to secure the Property. SOAF Reply ¶¶ 37-38. In any event, when Stokes arrived, Fermaint was present at the Property and there was a sign on the door saying the Property was not abandoned. Stokes left the Property at Fermaint's request. *Id.* Fermaint asserts that this was the first time the Defendants sought to possess the Property, that he told Stokes that he was maintaining the Property, and that he contacted law enforcement to ensure Stokes left the premises. SOAF Reply ¶ 2.

### E. July 25, 2018 Property Inspection

An occupancy inspection was performed on July 25, 2018. SOF Resp. ¶ 57. Tracy Hager, MCS's corporate representative, stated that the electrical meter indicated the electricity was off,

but Fermaint again disputes this fact on the ground that "it is not supported by sufficient evidence," SOF Resp. ¶ 54, but he does not explain why Hager's observations are insufficient to show the Property—in which he concedes he was not living—was vacant.

### F. Fermaint's Uniform Borrower Assistance Form

In June, Fermaint had informed Planet that he intended to short sell the Property. To evaluate the request for a short sale, Planet required Fermaint to complete a Uniform Borrower Assistance Form ("UBAF"). SOF Resp. ¶ 23. On August 22, 2018, Fermaint executed a UBAF and submitted it to Planet. SOF Resp. ¶ 23. The UBAF advised Planet that the Property was vacant and listed the Property as a secondary residence. SOF Resp. ¶ 24. Fermaint asserts that Planet did not receive the UBAF until September 15, 2018, over two weeks after the Defendants allegedly took possession of the Property on August 31, 2018. SOF Resp. ¶ 23 (citing "Defendants' SOF Exhibit B at Page 25," which appears to be Fermaint's "Short Sale Packet" and includes a stamp of "Submitted 9/15/2018" in the top right corner). *See* SOF Exh. B at 25.

### G. August 27, 2018 Property Inspection

On August 14, 2018, Planet authorized MCS to perform another occupancy inspection; the record does not explain why another occupancy inspection was needed. On August 15, 2018, MCS authorized a vendor to perform the inspection, which occurred on August 27, 2018. SOF Resp. ¶¶ 58-59. The Defendants assert that the Property was determined vacant, as shown by photos provided by the vendor showing vacancy postings, an electrical meter reading 0.0, the mailbox being removed, the pool being full and unmaintained, and various debris strewn about the rear of the Property. *Id.* ¶ 60. Notwithstanding his submission of the UBAF acknowledging that the Property was vacant, Fermaint disputes the allegations as insufficiently supported, correctly pointing out that the Defendants cite to SOF Exhibit G at Exhibit 19, which does not exist in the

record. SOF Resp. ¶ 60 (arguing that the evidence cited by the Defendants is also inadmissible hearsay, and other evidence shows the electricity was on after August 27, 2018); *id.* (stating that by August 27, 2018, MCS "had already sent vendors to the Property who had observed a posting by the Plaintiff indicating that the Property was not vacant and had encountered the Plaintiff at the Property and been informed by the Plaintiff that the Property was not abandoned.").

## IV.  Initial Secure on August 31, 2018

The parties dispute at what point Planet authorized MCS to secure the Property. The Defendants maintain that Planet only authorized MCS to secure the Property on August 30, 2018, and that MCS authorized vendor FTP to complete the "Initial Secure" that same day. SOF Resp. ¶ 62. Fermaint maintains, though, that this was not the first time they had authorized securing it, and disputes that the "authorization was based upon vacancy determinations." *Id.* Fermaint contends that Planet had authorized MCS to secure the property as early as June 2018, when Fermaint had barred Stokes from the Property. SOF Resp. ¶ 61 ("the defendants based their decisions solely on the inspections performed by vendors who had not encountered the Plaintiff at the Property.").

FTP completed the Initial Secure on August 31, 2018 by changing the locks, installing a lockbox, performing a plumbing pressure test, and photographing the interior and exterior of the Property. SOF Resp. ¶ 64. Fermaint admits that pictures taken by FTP on August 31, 2018 show that the Property had already been ransacked on or before August 31, 2018, but Fermaint contests the probative worth of those photos, noting that the photos simply show that the ransacking of the home occurred before the photos were taken and that "it is just as likely that the contractors sent to the property ransacked the property before they took photographs." Joint Memo Resp., ECF No. 167 at 5, 22.

It is undisputed that the Defendants did not have a court order authorizing them to enter or take possession of the Property when they secured the Property.

## V. The Defendants' Attempted Winterization of the Property

After the Initial Secure was completed on August 31, 2018, Planet authorized MCS to complete winterization of the Property. SOF Resp. ¶ 76. MCS assigned this work to a vendor on September 6, 2018, and the vendor went to the Property on September 24, 2018 to perform the winterization work order, but no work was performed. *Id.* The Defendants assert that the conditions of the toilets did not allow for winterization, so the vendor submitted a bid to address the toilets, which was not accepted. Fermaint disputes all of this, citing nothing in the record. SOF ¶ 77.

## VI. Fermaint's Discovery of Missing Personal Property

Fermaint returned to the Property on September 19, 2018, and by looking through the windows, noticed for the first time that some of his personal items had been taken. SOF Resp. ¶¶ 80, 85. Fermaint did not enter the Property that day because he was unable to open the Defendants' locks, and he filed a police report claiming certain items had been stolen. *Id.* ¶ 84. Fermaint did not personally see anyone remove items from the Property but alleges that the Defendants or their vendors stole his personal belongings. SOF Resp. ¶ 87. He testified that between when he was last on the Property before August 31, 2018, and when FTP took photographs of the Property on August 31, 2018, someone—either MCS or its vendors—must have been in the Property and displaced his personal items; he alleges they stole the items after breaking in and gaining access to the Property on August 31, 2018. SOF Resp. ¶ 86 (Fermaint states that "[t]he possibility that a break-in occurred prior to the forced entry by MCS' vendor FTP on August 31, 2018 is unlikely in light of the fact that the inspection report from August 27, 2018 did not record any signs of a break in and indicates that the property was secured with a lockbox.").

Fermaint further reasons that "FTP's August 31, 2018 report did not record any signs that the Property had been broken into prior to FTP's forceful entry." SOF Resp. ¶ 86.

The Defendants deny responsibility for any removal of Fermaint's personal property. Instead, they insist that it must have been burglarized before they replaced the locks on August 31, 2018, "as evidenced by Plaintiff's testimony and photographs of the property taken on August 31, 2018." SOAF Reply ¶ 14; SOF Resp. ¶ 65 (citing SOF Exhibit G at Exhibit 21, which does not exist in the record); *id.* ¶ 71. The Defendants contend that FTP documented the status of the Property and the actions it took related to the Initial Secure, and provided photos to MCS showing the before, during, and after process of completing the Initial Secure. SOF Resp. ¶ 67 (again citing SOF Exhibit G at Exhibit 21, which does not exist in the record). Fermaint disputes that the photographs show the before, during, and after because they do not include timestamps. SOF Resp. ¶ 67.[4] Planet's Senior Vice President of Default Servicing, Thomas O'Connell, declared that no one employed by Planet removed any items from the Property and Planet did not authorize MCS to remove any property; Fermaint disputes this, but cites nothing in the record. SOF Resp. ¶ 71.

MCS paid its vendors for the work that was completed on August 31 and September 19, 2019. Receipts for those payments include no indication that MCS paid any vendor for the removal of personal property or debris. SOF Resp. ¶¶ 90-92. Further, the Defendants allege that no one saw anyone remove anything. Property neighbor Kathy Leon testified that on September 19, 2018, she

---

[4] The Defendants assert that they denied FTP's bid for removal of personal property or debris, despite approving other bids for additional work at the Property. SOF Resp. ¶¶ 68-70. But the portions of the record cited by the Defendants do not support that contention, or do not exist. Further, the Defendants contend that the initial secure work order issued by MCS to FTP stated that no personal property or debris was to be removed from the Property. SOF Resp. ¶ 75 (citing SOF "Exhibit E, at Exhibit 21 p. 2 thereto"). The Court, however, cannot assess the allegation, which Fermaint disputes, because SOF Exhibit E contains no Exhibits within it.

observed men on the Property's driveway who went through the front door, and a truck with a long bed in the street, but she did not testify that she saw anyone remove anything. SOF Resp. ¶ 89.

## VII. Fermaint's Request for Access

After the Defendants secured the Property, Fermaint was unable to enter until October 28, 2018. SOF Resp. ¶ 93. On October 18, 2018, Adeline Lewis, Fermaint's short sale negotiator, sent the Defendants a letter requesting access to the Property. The letter informed them that personal property had been removed from the Property and requested immediate access to the Property be facilitated. SOF Resp. ¶ 96. MCS gave Lewis the lockbox code at the end of October 2018, though Fermaint maintains he accessed the Property on October 28, 2018 because MCS had given the lockbox code to Lozano on October 25, 2018. SOF Resp. ¶ 97. On October 28, 2018, Fermaint accessed the Property and determined what personal property items were missing. SOF Resp. ¶ 98. Fermaint says he attempted to lawfully regain access repeatedly, but he only cites to Lewis' October 18, 2018 letter. SOAF Reply ¶ 4.

The Defendants maintain that Fermaint never requested that Planet return any personal property items to him, but Fermaint characterizes Lewis' letter as his request for the return of the property. SOF Resp. ¶ 88. The Defendants also assert that Fermaint never requested access to the Property between September 19 and October 28, but Fermaint counters that he requested access via Lewis on numerous occasions. SOF Resp. ¶ 94 (citing SOF Exh. H, Exh. 158-8); SOAF Reply ¶ 4. The Defendants also assert that Lozano never requested access to the Property during this period, but the cited evidence does not support that assertion. SOF Resp. ¶ 95.

The Defendants assert that Fermaint does not know the value of the missing items. Fermaint disputes this, stating that he testified about the condition of the items and their replacement value and submitted internet sale listings of comparable items. SOF ¶¶ 81, 99.

13

**VIII.     Completion of Short Sale**

On September 5, 2018, Fermaint executed a contract for sale of the Property for $119,900. SOF Resp. ¶ 100. Planet approved Fermaint's request for a short sale and Fermaint sold the Property to that same buyer on December 14, 2018 for $119,900. SOF Resp. ¶ 102. On May 31, 2018, the amount due and owing on Fermaint's loan was $236,615.64, so by agreeing to the short sale, Planet accepted a sum which was more than $100,000 less than what was due and owing on the Mortgage. SOF Resp. ¶¶ 103-106. The Defendants therefore contend that Fermaint's claimed lack of Property access from September 19, 2018 until October 28, 2018 had no impact on the short sale transaction, which was successfully concluded, because the sale price remained the same. Fermaint disputes this, asserting that his lack of access caused unnecessary delay and complication of the short sale process. SOF Resp. ¶ 107.

**IX.     Planet's Relationship with MCS**

At all relevant times, Planet and MCS were parties to a Field Servicing Agreement ("FSA") that has governed their relationship since 2016. Per the FSA, once Planet learns a property is vacant or abandoned, it will authorize MCS to retain a local subcontractor to perform an occupancy inspection. If the subcontractor determines the property to be vacant, MCS will communicate this to Planet. MCS has no access or visibility to Planet's loan servicing records. If mortgagors call MCS with concerns related to their properties, MCS directs them to their mortgage companies.

Planet and MCS have an automated communications system known as the Mortgage Servicing Platform ("MSP"). If a property is delinquent, Planet advises MCS of that delinquency via MSP, which authorizes MCS to begin occupancy inspections of the property. After a subcontractor performs inspections, MCS advises Planet via MSP of the occupancy status as determined by the subcontractor. If a property is determined vacant based on MCS reports, Planet

will then authorize MCS to secure, winterize, or perform other appropriate tasks; it is undisputed that "a property which is classified as vacant and secured will not be secured by MCS without specific direction from PHL."[5]

The FSA defines MCS as an independent contractor. SOF Exh. D, ECF No. 158-4 at Exh. A (Field Service Agreement) ¶¶ 17, 21.9 ("Vendor [MCS] is not an employee, agent, or partner of Client [Planet], and shall perform its obligations hereunder as an independent contractor. . . . Neither party shall act nor represent itself, directly or by implication, as an agent of the other."). It also provides that services "shall be performed in a thorough and good workmanlike manner in compliance with applicable Client [Planet] guidelines and in compliance with applicable . . . law. Vendor [MCS] agrees to the standard of performance timeframe requirements set forth [below]." *Id.* ¶¶ 3-4 (Vendor shall maintain records "as is customary in the industry"); *id.* ¶ 7.1.1 (MCS's services will be provided in a manner "consistent with and in full compliance with [Planet's] then current servicing standards and guidelines and all [applicable] laws."); *see id.* at Schedule I ¶¶ 1.1-1.3 (MCS shall perform services "in accordance with the commercially accepted standards and procedures . . . [and] comply with the requirements set forth in this Agreement. . . . [MCS] shall complete each Property Inspection within the timeframe specified for each unique inspection type."); *id.* at Schedule II ¶ 2.1 ("[MCS] will perform property preservation services as directed by [Planet] including, but not limited to, lock changes, securing, boarding . . . [Planet] may initiate property preservation services by website request or by a mutually agreed process."). Further, the

---

[5] Fermaint also points to a part of the FSA which allegedly states that no property preservation services will be performed on homes that are actively listed for sale. The import of that assertion is unclear, but it is in any event unsupported. Fermaint cites to "Defendants SOF Exhibit D, Exhibit 7, Schedule II (*PageID # 1366*)," but there does not appear to be any Exhibit 7 or Page ID 1366 in SOF Exhibit D. SOF Exh. D, ECF No. 158-4. The Court's review of Schedule II of the FSA did not reveal any language pertaining to property preservation services performed on homes that are actively listed for sale. SOF Exh. D at Exh. A at 13-16.

FSA warrants that MCS will maintain insurance coverage with respect to its own employees and operations. *Id.* ¶ 8.

Thomas O'Connell, Planet's senior vice president for default servicing, testified that Planet does "not completely" delegate property preservation responsibility to MCS, though he declared that Planet does not supervise, direct, or control MCS's execution of the work. SOF Exh. A at 17:13-18; SOF Exh. D ¶ 9. He testified that Planet oversees and reviews the work via inspection reports provided by MCS. SOF Exh. A at 19:7-24; 33:8-15.

## X. MCS's Relationship with Vendors

MCS provides work orders to its vendors through an electronic "Vendor360" program. MCS pays the vendors based on invoices that are completed by the vendor and submitted for each work order. MCS and its vendors have a Mortgage Field Services Arbitration Agreement, also called the "VSA"—presumably short for Vendor Services Agreement—which allows the vendors to reject any work order they receive. Specifically, the VSA states, "Contractor has the complete and independent authority, in it is [sic] sole discretion, to reject or accept any and all Work Orders offered to it through the Vendor360 network by MCS on behalf of MCS clients[.]" SOF Exh. G at Exh. 4 and Exh. 11 (VSA) ¶ 1(a). A work order, however, is deemed accepted when made available on the Vendor360 network, and a vendor has just 24 hours to reject a Work Order. *Id.* ¶ 2. The VSA further requires all MCS vendors to obtain their own general liability and workers compensation insurance, among other policies, and provides, "Contractor is not required to perform any set number of Work Orders in a day, during a week, or on any particular day of the week." *Id.* ¶ 2.

The VSA further states:

> Contractor acknowledges and agrees that it is an independent contractor of MCS, it intends to create an independent contractor

> relationship with MCS, it believes an independent contractor
> relationship has been created with MCS, and that it is not an
> employee of MCS . . . Contractor has control over the manner or
> means by which Services are performed, and Contractor retains the
> right to accept or reject any Work Order offered to it through the
> "Vendor360" network by MCS on behalf of MCS Clients . . .
> Contractor is also solely responsible for determining . . . the order in
> which the Services are provided, the tools and equipment used to
> perform the Services, and the compensation and benefits provided
> to any Contractor Service Providers.

VSA ¶ 4.

MCS relies on its vendors to be specialists in the services they provide, as the VSA states,

"Contractor hereby represents and warrants to MCS that: (d) Contractor has the required skill,

experience and qualifications (including, without limitation all licenses and business permits

required by Law), to perform the Services[.]" VSA ¶ 12. MCS also requires them to obtain multiple

occupancy indicators, including overgrown grass, overgrown bushes, debris or trash laying

outside, the status of mail or utilities, communication with neighbors, and flyers posted on the

door. SOF Resp. ¶ 50. MCS requests that its vendors document what they see visually when

making a vacancy determination. SOF Resp. ¶ 52.

The VSA also states that "Work Orders will contain information necessary for Contractor

to adequately complete the requested Services, including the date by which the Services must be

completed based on the request of the MCS client. Contractor shall perform all Services promptly

and diligently in a workman like manner within the time requested by the MCS client." VSA ¶

1(a); *see id.* ¶ 1(c) ("Contractor shall complete and upload all documents necessary to complete a

Work Order by the time required by the MCS client, which documents may include . . .

photographs, damage reports . . . and such other documents[.]"). Vendors, however, have no

knowledge of the foreclosure status of property for which they are assigned work orders, and

simply follow the instructions provided in the work orders. SOAF Reply. ¶ 32. Finally, "MCS

reserves the right to reduce the amount of any invoice submitted by Contractor to the extent that MCS is not satisfied (in its reasonable discretion) with the underlying Services[.]" *Id.* ¶ 11(a).

## ANALYSIS

### I.     Agency Relationship

The Court first addresses an overarching issue—whether the Defendants can be held liable under Fermaint's tort theories of trespass, conversion, negligence, and civil conspiracy for the conduct of the subcontractors, who performed the property preservation services in this case. *See Jackson v. Bank of New York*, 62 F. Supp. 3d 802, 814 (N.D. Ill. 2014) ("Generally, a person injured by the tortious act of another must seek relief from the person who caused the injury.") (citing *Lawlor v. N. Am. Corp. of Ill.,* 368 Ill. Dec. 1, 983 N.E.2d 414, 427 (2012)). While the doctrine of *respondeat superior* is an exception to that rule, and provides that a principal may be liable for the acts of its agent, the doctrine cannot typically be used to impose liability on independent contractors. *Id.* If the vendors were not their agents, the Defendants maintain, then they cannot be liable under these tort theories.

The determination of whether a particular entity is an "agent" or an "independent contractor" is a factually intensive one. *Uesco Indus. Inc. v. Poolman of Wis., Inc.,* 373 Ill. Dec. 97, 993 N.E.2d 97, 112 (2013). The analysis turns primarily on the level of control that the alleged agent retains over the performance of its assigned work, including the manner and method in which the work is done. *Horwitz v. Holabird & Root,* 287 Ill. Dec. 510, 816 N.E.2d 272, 279 (2004). By contrast, "[a]n independent contractor is one who undertakes to produce a given result but in the actual execution of the work is not under the orders or control of the person for whom he does the work but may use his own discretion in things not specified * * * [and] without his being subject to the orders [of the person for whom the work is done] in respect to the details of the work."

*Horwitz,* 816 N.E.2d at 279 (quoting *Hartley v. Red Ball Transit Co.,* 344 Ill. 534, 176 N.E. 751, 753-54 (1931)). Other factors that bear on the question include "(1) the question of hiring; (2) the right to discharge; (3) the manner of direction of the servant; (4) the right to terminate the relationship; and (5) the character of the supervision of the work done." *Lawlor,* 983 N.E.2d at 427. In addition, "[a] person or entity that is appointed by an agent to perform functions assigned to the agent by the principal is known as a 'subagent.'" *Thakkar v. Ocwen Loan Servicing, LLC*, No. 15 C 10109, 2019 WL 2161544, at *7 (N.D. Ill. May 17, 2019) (citing *Restatement (Third) of Agency* § 3.15). Agents authorized to do so may "appoint subagents to perform those tasks or functions the agent has undertaken to perform for the principal." *Id.* (citing *AYH Holdings, Inc. v. Avreco, Inc.*, 357 Ill. App. 3d 17, 33, 826 N.E.2d 1111, 1126 (2005)). Consequently, "an action taken by a subagent carries the legal consequences for the principal that would follow were the action instead taken by the appointing agent." *Id.* (citing *Restatement (Third) of Agency* § 3.15, cmt. d.); *see Griffin v. Safeguard Properties Mgmt., LLC*, No. 18 C 5755, 2020 WL 6118572, at *3 (N.D. Ill. Oct. 16, 2020). On the agency theory of vicarious liability, Fermaint ultimately bears the burden of demonstrating that those who secured his Property were the agents of the Defendants. *Lawlor,* 983 N.E.2d at 427.

While the parties do not dispute the language contained in the FSA and VSA contracts, they dispute the nature of the relationship between Planet, MCS, and the subcontractors flowing from those agreements. The Defendants, of course, characterize MCS and its vendors as independent contractors. Specifically, Planet argues that while it authorizes MCS to secure and winterize properties, MCS has its own methods and procedures for the performance of that work. Joint Memo, ECF No. 160 at 13-14 ("[N]othing in the FSA suggests that PHL had any right or power to control the manner and method of how MCS performed its work" and there "is no

19

evidence that MCS controlled the manner and method of how its vendors carried out its tasks");
*see Jackson*, 62 F. Supp. 3d at 814-15 ("A minimal degree of control can be inferred from Litton's instruction that the lockboxes be secured using a specific code, but this alone does not suggest that Litton had any say over when or how Realty Executives completed the property inspection or securitization. . . . As with Realty Executives Target . . . there is no evidence that Litton controlled or supervised Safeguard's work in any respect."). Planet also alleges that there are no internal guidelines or protocols that MCS must follow, but the FSA provides that MCS must follow Planet's guidelines and servicing standards.[6] Joint Memo at 13-14 (distinguishing the present case from *Fed. Nat'l Mortg. Ass'n v. Obradovich*, No. 14-CV-04664, 2020 WL 2767578, at *2 (N.D. Ill. May 28, 2020), where the court denied summary judgment and rejected the defendants' agency argument because the lender provided its own guidelines in the form of a Property Preservation Guide). The Defendants further emphasize that their subcontractors (1) can reject work orders at their own discretion, (2) have "leeway of 48 hours to complete the work," (3) use their own tools and equipment, (4) maintain their own insurance, and (5) are not paid hourly. MCS Memo, ECF No. 157 at 3.

Fermaint predictably disagrees, characterizing MCS as the agent of Planet, and the vendors as agents of MCS and Planet. He argues that the Defendants exercise control over the downstream entities with which they contract, highlighting that (1) the Defendants maintain hiring and discharge capabilities, (2) the FSA requires MCS to perform services in accordance with Planet's timelines, servicing guidelines, and standards, and (3) the VSA requires vendors to perform in the

---

[6] The Defendants also assert that all work orders issued by MCS to its subcontractors allow flexibility in the timeline to complete the order. But the Defendants cite to "Exhibit G at Exhibit 19" and "Exhibit 18," and SOF Exhibit G does not contain any Exhibit 18 or Exhibit 19. SOAF Reply ¶ 28. The Court therefore cannot accept the fact.

manner and time set by MCS, to its reasonable satisfaction, subject to damages or forfeiture of all compensation. *See* SOAF ¶ 20 (arguing that "contractual terms requiring unquestioning obedience to the orders received constitute sufficient control as to make MCS and its vendors Planet's agents."). Fermaint maintains that the "satisfaction clause" in the VSA—allowing MCS, in its reasonable discretion, to demand money from or refuse to pay a vendor if the vendor fails to timely execute the work, upload documentation, or otherwise perform services to its satisfaction—is powerful evidence of control and would allow a reasonable jury to find that a vendor is MCS's agent. *See HSBC Mortg. Servs., Inc. v. Equisouth Mortg., Inc.*, 873 F. Supp. 2d 923, 928 (N.D. Ill. 2012) ("Through a satisfaction clause, a party's exercise of judgment or discretion is a condition for its duty to perform."). The Defendants argue that the satisfaction clause only allows them to take retroactive action after work is completed, which cannot constitute control over the work, and that giving instructions about the services required in a work order does not constitute control over the manner or method of performance. Joint Reply, ECF No. 170 at 8-9.

The Court finds that there is a genuine dispute of material fact about the alleged agency relationships in this case. *See Jackson*, 62 F. Supp. 3d at 816 ("Some of the facts suggest that [the subcontractor] was an agent of Safeguard, and others suggest that he was an independent contractor; it is not an evidentiary slam dunk either way" so "a genuine issue of fact precludes summary judgment on the issue of whether Safeguard can be vicariously liable for the acts of [the subcontractor]").

"Under Illinois law the existence and scope of an agency relationship are questions of fact, unless the relationship is so clear as to be undisputed." *Thakkar*, 2019 WL 2161544 at *5 (quoting *Om v. Weathers*, No. 91 C 4005, 1993 WL 408359, at *3 (N.D. Ill. Oct. 12, 1993)); *see also AYH Holdings*, 826 N.E.2d at 1127; *Santana v. State Bd. of Elections*, 371 Ill. App. 3d 1044, 1054, 864

N.E.2d 944, 952 (2007). The answer here is not so clear that it should be kept from a jury. As the Defendants highlight, there are aspects of their relationships that point to MCS and the vendors being independent contractors. The FSA and VSA label the vendors as such, and the vendors maintain their own insurance, use their own tools and equipment, and can reject work orders. But other facts support the opposite conclusion. Crucially, the FSA requires that services be performed in compliance with Planet's timelines, guidelines, and servicing standards. Consistent with that language, Planet concedes that it oversees and reviews MCS's work. *See* O'Connell Dep at 17:13-18 (Planet does "not completely" delegate property preservation to MCS); O'Connell Declaration ¶ 9. And while the VSA allows a vendor to reject a work order, the system used by MCS treats the work orders as accepted unless the vendor rejects them within 24 hours. The VSA further requires that vendors document what they see and inspect properties by obtaining multiple occupancy indicators, and MCS can hold subcontractors liable if they are dissatisfied with the vendors' performance or timeliness. Together, this evidence supports Fermaint's contentions that Planet and MCS exercise control over the vendors and that MCS acts simply as a conduit through which Planet orders vendors to perform property preservation services according to its terms and instructions. And taken as a whole, these facts distinguish the present case from *Jackson*, where the court granted summary judgment to the loan servicer on the plaintiff's trespass claim because there was no evidence of authority or control. 62 F. Supp. 3d at 814-15 (explaining that Litton's instruction to Realty Executives to use a specific lockbox code "alone does not suggest that Litton had any say over when or how Realty Executives completed the property inspection or

securitization" and "there is no evidence that Litton controlled or supervised Safeguard's work in any respect").[7]

A reasonable juror could conclude that the operations of the FSA and VSA, including the satisfaction clause, give the Defendants the right to control how and when MCS's vendors perform Planet's work contained in the MCS work order, such that the vendors are agents of the Defendants. MCS Memo Resp., ECF No. 168 at 3 (arguing that "[b]y utilizing the 'contractor breach' paragraph 1(d) of the VSA [ ], along with the satisfaction clause found in paragraph 11(a) of the VSA [ ], Planet retains indirect control over every facet of MCS's vendor's performance."); *see Jackson*, 62 F. Supp. 3d at 815 (holding that there is a "question of fact as to whether . . . the vendor retained by Safeguard, acted as Safeguard's agent" because the work order "contained very specific information about the services to be performed, giving [the subcontractor] very little room to make independent decisions about the work to be performed" and Safeguard gave him a "manual setting forth its detailed procedures for winterization and other work"). And since a jury could find that the vendors are agents of the Defendants, summary judgment predicated on the actions of the vendors is not warranted. *See Griffin*, 2020 WL 6118572 at 3 ("A jury could reasonably find that Safeguard, Ally, and Cenlar were linked through a cascade of agent and subagent relationships and therefore are each liable for Alissa's purported actions."); *Obradovich*, 2020 WL 2767578 at *6-7 (denying summary judgment as to trespass against Safeguard because the "testimony does not exclude the possibility that Safeguard nonetheless required subcontractors to follow [Fannie Mae and Seterus's] Property Preservation Guide or some other guidelines. . . . Safeguard could

---

[7] Cases including *Jackson* and *Mighty v. Safeguard Props. Mgmt., LLC*, No. 16 C 10815, 2018 WL 5619451 (N.D. Ill. Oct. 30, 2018) also are "merely persuasive authority rather than controlling precedent" and "even if [not distinguishable], to the extent that *Jackson* or *Mighty* would suggest a different result in this particular case, the Court does not find them persuasive." *Thakkar*, 2019 WL 2161544 at *7.

certainly demand that contractors follow specific guidelines without knowing precisely how a contractor performed the finer details of a given task. . . . In sum, there is a dispute of fact as to whether Safeguard controlled the process by which YJM performed its work such that YJM should be considered Safeguard's agent."); *Thakkar*, 2019 WL 2161544 at *6 ("a jury could reasonably conclude that a series of agency relationships existed among the defendants because in each relationship, one party possessed actual, express authority over another" and the contracted parties "had to perform the task within specific time frames, according to specific instructions.").

Fermaint also separately argues that the Defendants can be held directly liable, as opposed to vicariously liable, under the *Restatement (Second) of Torts*. Joint Memo Resp. at 14-15 (citing *Janda v. Kwiatkowski*, No. 05 C 154, 2007 WL 257676, at *5 (N.D. Ill. Jan. 23, 2007) ("For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . orders or induces the conduct, if he knows or should know of circumstances that would make the conduct tortious if it were his own . . . .") (quoting *Restatement (Second) of Torts* § 877 (1979)); *Cebulske v. Johnson & Johnson*, No. 14-CV-627-DRH-SCW, 2015 WL 1257778, at *4 (S.D. Ill. Mar. 17, 2015) (holding that the plaintiff stated a concert of action claim under Illinois law because "Comment (a) to Restatement (Second) of Torts § 876 states that 'parties are acting in concert when they act in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result. The agreement need not be expressed in words and may be implied and understood to exist from the conduct itself.'"); *Lilly Indus., Inc. v. Health-Chem Corp.*, 974 F. Supp. 702, 708 (S.D. Ind. 1997) ("The Restatement (Second) of Torts [§ 158 (1965)] . . . defines liability for trespass as follows: [']One is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally (a) enters land in the possession of the other, *or causes a thing or a third person to do so*'")

(emphasis added)). Fermaint asserts that *Jackson* and other cases relied on by the Defendants are therefore inapposite, because those courts only undertook an agency analysis, ignoring the *Restatement* which "authorize[s] the imposition of liability upon Planet for any third-party's trespass triggered by Planet's order to secure Fermaint's property." Joint Memo Resp. at 16. The Defendants characterize Fermaint's direct liability argument as "nothing but argument as there is no evidence that either Planet or MCS ordered or induced their respective subcontractors to perform a tortious act to bring them within liability under the Restatement." Joint Reply at 8 ("PHL was very clear in ordering MCS to only perform an Initial Secure and not remove any property" and "there is no evidence MCS ordered or induced their vendor subcontractors to do anything that amounted to a tort.").

The Court agrees, but only in part, with Fermaint on this point. For the reasons stated later in this opinion, even disregarding the missing personal property that Fermaint alleges was stolen by the Defendants or the vendors, Fermaint's trespass to real property claims survive. Whether or not the vendors qualified as agents, a reasonable juror applying the Restatement's principles of direct liability could impose liability upon Planet or MCS for proximately causing a trespass by ordering the vendors to secure Fermaint's property. (The Court agrees, however, that there is no evidence to support direct liability for Planet or MCS for the missing personal property.[8]) And

---

[8] Whether removal of personal property from the Property was within the scope of the agency turns on disputed issues of fact such as what instructions the vendors were given in how to carry out the Initial Secure and the import of applicable regulations on the vendors' execution of MCS's instructions. *See* SOF Resp. ¶¶ 68, 70-71, 74-75 (While undisputed that FTP provided bids to MCS to remove personal property and debris from the Property, Fermaint disputes the Defendants' assertions (1) that the bids for removal of personal property and debris were not approved, (2) that Planet never authorized MCS or any vendor to remove any personal property or debris, and (3) that the initial secure work order issued by MCS to FTP stated that no personal property or debris was to be removed from the Property); *id.* ¶ 75 ("The Work Orders in the case contradict the servicing standards which contemplated emptying the home."); *see also* Joint Memo Resp. at 21-22 (arguing that "Planet also ignores its knowledge that its order to undertake an initial

because a jury could rationally conclude that the vendors were agents of the Defendants, or that the Defendants directly and proximately caused a tortious act, the Defendants' additional arguments must also be addressed.

## II. Claims Involving Personal Property

The Defendants make another overarching argument, asserting that the portions of Fermaint's claims based upon theft of his personal property—conversion, trespass to chattel, and parts of the ICFA and negligence claims—fail as a matter of law because there is no actual or circumstantial evidence to prove that MCS's contractors stole or removed his personal property. Joint Memo at 7. They assert that their vendor work orders expressly excluded the removal of personal property, that their subcontractors aver that they did not take anything, and that Fermaint provides no evidence to the contrary.

In support, the Defendants compare this case to *Jackson*, 62 F. Supp. 3d at 820 (granting summary judgment on conversion claim, but not trespass and negligence). There, after foreclosure proceedings had commenced against the plaintiff, he left the state for months and returned to discover that the personal property that he had left in his house was missing, He brought a conversion claim against the lender and its alleged agents, who had accessed the house to conduct various property preservation services while he was away. In granting summary judgment for the defendants on the conversion claim, the court reasoned that the plaintiff "essentially asks the Court to infer that [the subcontractors] converted his items because they accessed [his] residence.

___

secure of Fermaint's property would ultimately end with the removal of everything constituting personal property or debris from inside the home. This is because the FHA guidelines required the property be left in broom-swept condition. In other words, there is a direct causality flowing from Planet's secure order to the loss of Fermaint's property based upon Planet's illegal order to invade Fermaint's home in violation of law.").

Plaintiff has not introduced any evidence to counter [the subcontractors'] deposition testimony that they did not remove any of the property." *Id.* at 816 ("Plaintiff cannot demonstrate a genuine issue of material fact simply by calling into question the credibility of the evidence before the Court.").

Fermaint predictably counters that under these circumstances, a factfinder could infer that the Defendants converted his personal property. He points out that (1) the Defendants took possession and exclusive control of the Property on August 31, 2018, (2) Kathy Leon reported seeing men and a truck at the Property, and (3) Ana Lozano confirmed seeing the missing items at the Property in June 2018, and stated that pictures taken after the Defendants took possession showed boxes tipped over and their contents on the floor.[9] Joint Memo Resp. at 4-5. He also insists that there is an "absence of evidence" that "any criminal third party gained entry into" the Property before the Defendants removed Lozano's lock on August 31, 2018, so "there is a reasonable inference MCS's vendors ransacked the property and removed any items they believed valuable before taking their photographs." Joint Memo Resp. at 5-6.

This is a dispute a jury must resolve (if it determines that the vendors were the Defendants' agents). Although the evidence Fermaint relies on does not indisputably establish that the vendors removed Fermaint's personal property from the house, a jury would not be irrational in concluding that the preponderance of the evidence supports that conclusion. It is undisputed that Fermaint's

---

[9] Fermaint also states that when subcontractors Michael Levy Sr. and Michael Levy Jr. performed pool and shrub tasks at the Property in September 2018, neighbors called the police and reported three men removing property and placing it on a truck. Fermaint cites to SOAF Exhibit L at Exhibit 19, which appears to be a police report. Joint Memo Resp. at 4; SOAF Exh. L, ECF No. 166-2. But there is no discussion of this incident anywhere in the statements of facts, and the report from the police officer is hearsay, so the Court disregards it. *Boyd v. City of Chicago*, 225 F. Supp. 3d 708, 716 (N.D. Ill. 2016) (disregarding facts where the plaintiff relied on inadmissible hearsay because "[h]earsay is every bit as inadmissible at summary judgment as it is at trial."). In addition, Fermaint concedes that the Property had been ransacked by August 31, 2018, nearly two months before this alleged incident.

realtor, Lozano, had secured the Property with her own lock from June 2018 until the Defendants removed it on August 31, 2018. At some point, before the MCS vendors took pictures of the Property interior on August 31, 2018, the house was ransacked. Without more, to be sure, a reasonable juror could not infer that the Defendants stole Fermaint's belongings based solely on their accessing the interior and changing the locks. *Jackson*, 62 F. Supp. 3d at 816 (refusing to "infer that [the subcontractors] converted his items because they accessed [his] residence."). Crucially, though, the Property here had been secured by Lozano's lock before August 31, and Fermaint points out that there is no evidence—neither in the Defendants' or the subcontractors' inspection reports from June, July, or August, nor anywhere else—that the Property had been accessed by a third party. Joint Memo Resp. at 5-6. This distinguishes the present case from *Jackson*, where the court could not "reasonably infer" that the "house was locked or 'secure' when Plaintiff left it in June." *Jackson*, 62 F. Supp. 3d at 809. So, unlike in *Jackson*, the Property here had been secured with the personal property in the home before the Defendants accessed it and placed their own lock on the door. In addition, it is undisputed that when making a vacancy determination, vendors conduct thorough inspections and are supposed to look at multiple sides of the property to look for signs of vacancy, documenting what they see visually. One might expect, therefore, that any signs of a break-in would have been recorded by MCS or its vendors during their June, July, or August inspections—yet they recorded none. Under these circumstances, a reasonable jury could conclude based on the circumstantial evidence that it is more probable, as

opposed to merely possible, that the Defendants or their subcontractors removed some of Fermaint's personal property.

### III.    Entry Without Order of Possession

The Defendants also argue that Fermaint's non-conversion claims—ICFA, FDCPA, trespass, negligence, breach of contract, and civil conspiracy—fail as a matter of law because they "rest on the unsupportable contention that there was an illegal and unauthorized entry onto the Property." Joint Memo at 10. Indeed, Fermaint's primary grievance underlying these claims is that Planet skirted and expedited the foreclosure process, engaging in self-help repossession of the Property by failing to obtain an order of possession from the foreclosure court before changing the locks at the Property. *See* Joint Memo Resp. at 29 (alleging the Defendants took possession intending to "bully, intimidate and buffalo consumers to abandon their homes and their legal possessory rights"). Fermaint asserts that, having filed a foreclosure action, the Defendants were required, but failed, to adhere to the Illinois Mortgage Foreclosure Law, 735 ILCS 5/15-1101, *et seq*. ("IMFL") as the exclusive mode of procedure to obtain access or possession.

The Defendants, in contrast, maintain that no such order was required under the law because the Mortgage permitted them to preserve and protect the Property. And having rightfully determined that the Property was vacant, they say, their actions were reasonable. *See* Joint Memo at 1 (explaining that mortgages often allow mortgagees "to enter and winterize vacant property to prevent the pipes from bursting in the event heat is discontinued and to secure the property against vandals and burglars."). Specifically, the Mortgage contract provided, "Lender may inspect the Property if the Property is vacant or abandoned or the loan is in default. Lender may take reasonable action to protect and preserve such vacant or abandoned Property." SOF Resp. ¶ 7.

As an initial matter, the Court recognizes that there is no genuine dispute that the Property was vacant on August 31, 2018. Fermaint admits that no one lived at the Property during the relevant period and that he submitted a UBAF to the Defendants on August 22, 2018 representing that the Property was vacant. He further testified that he visited the Property only six times, and spending only a few minutes on each occasion, between October 2017 and December 2018, when he sold it. Still, he implies that the Defendants were not reasonable in concluding that his Property was vacant by disputing many, if not all, of the facts asserted by the Defendants on that point. For instance, he disputes their assertions that: (1) the electricity was turned off in June 2018; (2) he received a text from his nephew informing him of the Defendants' determination that the Property was vacant, (3) he received the Defendants' June letter informing him that they had determined the Property to be vacant, and (4) by the time the Defendants ordered and executed the Initial Secure on August 31, 2018, they had received and reviewed his UBAF. These disputes are not material, however, unless they support a contention by Fermaint that the Property was not vacant—and Fermaint does not dispute that the Property was in fact vacant when FTP performed the Initial Secure. As explained below, however, the fact that the Property was vacant does not mean all of Fermaint's claims fail at summary judgment.

The Defendants largely rely on *Schweihs v. Chase Home Fin., LLC* to argue that Illinois law permitted them to access and secure the Property without an order of possession from the foreclosure court. 2015 IL App (1st) 140683, 41 N.E.3d 1011. In that case, the defendants physically entered the borrower's home while foreclosure proceedings were ongoing. The mortgage granted the lender "the right, in the event of a default by Schweihs, to enter onto the property to make repairs." *Id.* ¶ 4 (the mortgage stated, "Lender may do . . . whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may

include . . . entering on the Property to make repairs."). After the plaintiff defaulted on the mortgage, and based upon a vendor's determination that the property was vacant, the defendants placed an initial secure order. Subcontractors thereafter arrived and gathered information for 45 to 90 minutes by knocking on the door, speaking to neighbors, checking utility meters, and observing the exterior. They then obtained permission to execute the secure order, "removed the door lock," and crawled through the doorway, only to find that the plaintiff was inside the home. *Id.* ¶¶ 6-10 (the plaintiff called her lawyer and the police). Based in part on the emotional trauma she allegedly suffered, the plaintiff filed a complaint alleging trespass, private nuisance, intentional infliction of emotional distress ("IIED"), and negligence. In support of her IIED claim, the plaintiff argued that the defendants engaged in reckless conduct by circumventing the Illinois foreclosure law by failing to obtain a court order of possession. *Id.* ¶¶ 28-29 (citing Section 15-1701 of the IMFL) (the plaintiff "asserts that because defendants had no such court order, their execution of the initial secure order was improper.").

The Appellate Court affirmed summary judgment for the defendants on the IIED claim, finding that a "proper understanding of the foreclosure law illustrates why this argument is incorrect." *Schweihs*, 2015 IL App (1st) 140683 ¶ 30. It explained that the IMFL provisions do not "absolutely prohibit[ ] any lender entry to secure the property or make repairs during the redemption period[10][.]" *Id.* ¶ 31 ("There is a huge difference between the right to possession for residential purposes which these statutes address, and the right to merely enter to make repairs."). In addition, the court noted that "in any event, Schweihs, by signing the mortgage, had presumptive knowledge of the clause which expressly stated that Chase could enter onto her property to make

---

[10] The "redemption period" is the roughly seven-month period during foreclosure proceedings where a borrower is permitted to pay off or refinance the loan. *See* 735 ILCS 5/15-1603.

repairs if she fell into default." *Id.* ¶ 32 (citing *Asset Exch. II, LLC v. First Choice Bank*, 2011 IL App (1st) 103718, ¶ 43, 953 N.E.2d 446, 456 ("One is under a duty to learn, or know, the contents of a written contract before he signs it . . . the law is that a party who signs an instrument relying upon representations as to its contents when he has had an opportunity to ascertain the truth by reading the instrument and has not availed himself of the opportunity, cannot be heard to say that he was deceived by misrepresentations.")). The Illinois Supreme Court also affirmed, noting that "[b]y removing one secondary lock on the premises, defendants were securing the property for entrance for repairs, not taking possession of the property for residential purposes." *Schweihs v. Chase Home Fin., LLC*, 2016 IL 120041, ¶ 54, 77 N.E.3d 50, 64; *id.* ¶ 57 ("We find plaintiff's reliance on foreclosure law unconvincing. . . . Contrary to plaintiff's argument that defendants had no legal justification for their entry into the property, plaintiff signed a note with the mortgage that . . . allowed Chase to enter the property to make repairs if plaintiff fell into default. . . . Although plaintiff argues that the house was not in need of repairs, she does not explain how defendants were to know or determine that.").

It is therefore not a per se violation of the IMFL for the Defendants to have entered the locked and secured Property without a court order while foreclosure proceedings were ongoing. *Schweihs* does not, however, stand for the proposition that a mortgage provision like the one here—permitting the Defendants to inspect and take reasonable action to protect and preserve the vacant Property—precludes tort or statutory liability as long as the Property is vacant. Indeed, the Appellate Court clarified that by affirming summary judgment on the IIED claim, it did "not intend in any way to comment on whether defendants' conduct amounted to a trespass. Trespass is a different tort with different elements, and that claim is still pending in the trial court[.]" 2015 IL App (1st) 140683 ¶ 38 (concluding merely that no reasonable juror could find the conduct ***extreme***

*or outrageous*). So, a lender, servicer, property preserver, or vendor may, in certain circumstances, access a property in foreclosure without an order of possession without being subject to liability for intentional infliction of emotional distress. But whether their conduct is actionable under a specific tort or statute depends on factors like the terms of the mortgage contract and the facts of the case. *See Boyd v. U.S. Bank, N.A., ex rel. Sasco Aames Mortg. Loan Tr., Series 2003-1*, 787 F. Supp. 2d 747, 756 (N.D. Ill. 2011) (denying motion to dismiss ICFA unfair practice claim, despite that the mortgage permitted the defendants to enter and secure the property in the case of default, because the plaintiff did not "allege that the Defendants merely *secured* his home without his permission; he alleges, rather, that Defendants broke into and ransacked his home and padlocked his door, thus *dispossessing* him of the property [ ]. Accepting these allegations as true, Defendants' actions offended public policy as embodied in the IMFL.").

Relatedly, the Defendants argue that their conduct was reasonable and therefore authorized by the Mortgage terms. They insist that all they did was inspect the Property pursuant to their vacancy determinations and take reasonable action to protect and preserve it, so all of Fermaint's claims must fail. *See* Joint Memo at 11 (arguing that the loan instrument "authorizes an Initial Secure when the property is vacant, as opposed to actually abandoned"). Fermaint maintains, however, that the Defendants' conduct cannot be reasonably characterized "as simply securing Fermaint's property." Joint Memo Resp. at 8-9. *See, e.g., Hill v. Wells Fargo Bank, N.A.*, 946 F. Supp. 2d 817, 820, 826 (N.D. Ill. 2013) (complaint adequately alleged unfair conduct under the ICFA because the property preservation company "broke into the [ ] home several times, and . . . sought to render it inaccessible to or uninhabitable by the Hills by replacing the locks" while the plaintiff was still defending the foreclosure action); *id.* ("[T]he court must conclude at this stage that LPS was hoping that its illegal conduct would ultimately drive the Hills out of their home so

that Wells Fargo could take possession without having to go through the potentially lengthy foreclosure process mandated by the Illinois Mortgage Foreclosure Law"). The Defendants in reply argue that cases subsequent to *Schweihs* "have been faithful to the distinction the Supreme Court made between possession under the IMFL and the contractual right to secure and enter vacant properties where the right is provided in the mortgage," and that the FHA guidelines permit them to secure such properties. Joint Reply at 12-13 n.2 (citing *Mighty v. Safeguard Properties Mgmt., LLC*, No. 16 C 10815, 2018 WL 5619451, at *6 (N.D. Ill. Oct. 30, 2018) ("Plaintiffs' reliance on foreclosure law is unpersuasive") (citing *Schweihs*)).

The Court disagrees with the Defendants that the Mortgage authorized their conduct in this case as a matter of law. Importantly, despite the Defendants' insistence, the loan does not so explicitly authorize an "Initial Secure" when the Property is vacant. Nor does it explicitly authorize entering to make repairs, like the mortgage in *Schweihs*. Instead, it authorizes "reasonable action to protect and preserve the vacant property." The Court finds that there is a genuine dispute of material fact regarding whether the Defendants took reasonable action to protect and preserve the vacant Property in this case.

While the Property was vacant, the Defendants knew that Fermaint intended to short sell the Property, and that his personal property remained in the house. Joint Memo at 10 (admitting a bed, furniture, and miscellaneous items were left behind). They also importantly concede that the Property was already secured by Fermaint's realtor's lock. Only two months before, the Defendants' vendor Tim Stokes had visited the Property and encountered Fermaint, who told Stokes that the Property was not vacant or abandoned. This evidence tends to indicate that, while the Property was vacant, Fermaint was still accessing or using the home periodically, and possibly

even showing the home to potential buyers.[11] The Defendants further fail to explain why the Property was at risk or in need of securing, given that the Property was already secured by the realtor's lockbox. And drawing all inferences in favor of Fermaint, it is not clear that winterization of the Property was necessary or reasonable in late August. *See Obradovich*, 2020 WL 2767578 at *2 (subcontractor was ordered to change the locks and winterize the property in January). Fermaint disputes that the electricity had been turned off, and no other evidence in the record evinces a need for the Defendants to access the interior of the Property to preserve or protect it. It is true, as the Defendants point out, that their actions here did not result in a lost short sale or physical property damage like in *Obradovich*. But Fermaint was dispossessed of the Property for almost two months, as he maintains that he did not obtain the ability to access the Property from the Defendants until October 25, 2018. The Court is thus not convinced that the conduct here was reasonable as a matter of law. Because a reasonable juror could conclude based on the evidence that the Mortgage did not permit the Defendants to dispossess Fermaint by changing the locks under these circumstances, their argument is rejected. *See id.* at *5 (where the defendants "changed the lock on the front door of the house, thus interfering with the Obradoviches' possessory rights . . . [t]he question, then, is whether any reasonable factfinder could conclude that this interference was wrongful.").

Courts in this District have denied summary judgment in cases involving ICFA, trespass, and conversion claims where defendants like those here secured a plaintiff's property by changing locks. *See Obradovich*, 2020 WL 2767578 at *2, 8 (the counterclaim defendants changed the locks on the property and conducted a winterization without the plaintiffs' consent, and the court held

---

[11] Fermaint genuinely disputes that he had received any notice that the Property had been determined to be vacant, so any lack of correspondence from Fermaint to the Defendants does not support their position.

the ICFA claim of unfair practices survived because "a jury could conclude that invading and modifying the property of a homeowner in the manner claimed by the [plaintiffs] was sufficiently oppressive"); *Thakkar*, 2019 WL 2161544 at *5, 15 (denying summary judgment in part because the mortgage terms "could not justify the securing of the property, changing of the locks, and disposing of personal property found in the house."). And unlike *Schweihs*, the Defendants here did not merely remove a lock and enter the Property to make repairs; they placed their own lock on the home "thus ***dispossessing*** him of the property[.]" *Boyd*, 787 F. Supp. 2d at 756.

The Defendants correctly point out that in *Obradovich* and *Thakkar*, the mortgage terms authorized property preservation efforts only if the property were abandoned, as opposed to merely vacant. *Thakkar*, 2019 WL 2161544 at *4 (if the borrower "has abandoned the Property, then Lender may do . . . whatever is reasonable or appropriate to protect Lender's interest in the Property . . . including . . . securing and/or repairing the property," which may include "entering the Property to make repairs, change locks . . . and have utilities turned on or off."); *Obradovich*, 2020 WL 2767578 at *6 (lender could reasonably protect its interest by securing or repairing the property if the borrowers failed to perform their obligations or abandoned the property, and the court held that "a reasonable jury could conclude" that the plaintiffs "had not abandoned the Property and that the Counterclaim Defendants violated [their] possessory interest in the Property by trespassing to perform an unwanted winterization."). But the fact that the Mortgage here did not have an abandonment requirement, and that the Property was in fact vacant, does not, for the reasons already stated, mean that the Defendants' conduct was reasonable as a matter of law. A jury might agree with the Defendants that after determining that the Property was vacant, they were reasonable in inspecting the Property, entering the interior, performing a plumbing pressure test, taking pictures, and changing the locks—but a reasonable juror could disagree.

36

The Defendants cite to *Lath v. PennyMac Loan Servs., LLC*, where the court granted summary judgment for the defendant after the defendant determined the property was vacant and changed the locks. No. 18-CV-928-PB, 2020 WL 1957931, at *1 (D.N.H. Apr. 23, 2020). Like here, the mortgage agreement authorized the defendant to "inspect the Property if the Property is vacant or abandoned or the loan is in default" and to "take reasonable action to protect and preserve such vacant or abandoned property." *Id.* The court found that changing the locks did not constitute conversion, in part because the plaintiff "cannot show that [the defendant's] conduct in changing the locks was 'unauthorized' or 'wrongful.'" *Id.* at *4 (internal citations omitted) ("[The defendant] had a legitimate reason, sanctioned by the express terms of the mortgage agreement, to change the locks. The mortgage agreement authorized [the defendant] to take 'reasonable action' to secure the unit in the event of vacancy. The undisputed evidence shows that [the defendant] changed the locks after the unit was left vacant and uninhabitable. There is no evidence that this action was anything but reasonable.").

*Lath*, however, while not binding on this Court, is also distinguishable. For one, the need for winterization and securing was more acute in *Lath*. The defendant there changed the locks to the unit in February, the middle of winter, after posting a vacancy notice on Lath's door in November. The "undisputed evidence" also showed that the building had become "uninhabitable." *Id.* at *4. The facts are different here, where there is no evidence that the Property was uninhabitable, the Property was secured by Fermaint's realtor's lock, it was still summer, the Defendants had encountered Fermaint at the Property, and there was reason to believe that Fermaint was in the process of securing a buyer for the Property. The Defendants cite no case

holding that in these circumstances, when a property is under foreclosure proceedings, a lender or its agents may secure the property in a manner that dispossesses the borrower.[12]

For these reasons, the Court cannot find that breaking into Fermaint's Property and changing the locks, thereby denying him access to his real and personal property, constituted reasonable action precluding liability on Fermaint's non-conversion claims. Having found that there is a genuine issue of material fact regarding whether the Defendants' conduct was authorized by the contract terms, the Court will address the arguments made by the Defendants regarding each of Fermaint's specific claims and legal theories.

## IV.    Conversion

If their no-agency and no-theft arguments fall short, the Defendants also assert that the conversion claim must fail because there is no evidence that Fermaint demanded that Planet or MCS return his personal property, which is a necessary element of conversion in Illinois. Joint Memo at 15 (citing *A.T. Kearney, Inc. v. INCA Int'l, Inc.*, 132 Ill. App. 3d 655, 664, 477 N.E.2d 1326, 1334 (1985) (the elements of conversion are "(1) unauthorized and wrongful assumption of control or ownership by one person over the personality [sic] of another; (2) the other person's right in the property; (3) the right to immediate possession of the property; and (4) *a demand for possession*.") (emphasis added)); *see Carroll v. Curry*, 392 Ill. App. 3d 511, 515, 912 N.E.2d 272,

---

[12] The Defendants also argue that the mortgage "plainly allows the lender to *enter* the Property if 'the Property is vacant or abandoned or the loan is in default.'" Joint Memo at 10 (emphasis added). Defendants again mischaracterize the contract, which states that the "Lender may *inspect* the Property if the Property is vacant or abandoned or the loan is in default"; the term "inspect" is not defined further. SOF Resp. ¶ 7 (emphasis added); *compare Thakkar*, 2019 WL 2161544 at *4 (the mortgage stated, "If it has reasonable cause, Lender may inspect *the interior* of the improvements on the Property.") (emphasis added). Fermaint insists that the term "inspect" alone did not permit the Defendants to access the interior of the Property, but even if it did, the question remains as to whether the Defendants' conduct in putatively inspecting and securing the Property was reasonable.

276 (2009) ("a replevin action generally cannot be maintained until the plaintiff has made a demand for the surrender of the property and the defendant has refused"). Fermaint responds with two arguments. First, he says he did demand the return of his personal property through his representative Adeline Lewis, who sent a letter to the Defendants. Joint Memo Resp. at 19-20 (citing SOF Exh. H at Exh. 10). Second, he argues that any demand would have been futile.

Any demand for Fermaint's property would clearly have been futile here because the Defendants continue to maintain that they never took or possessed the property. "The purpose of the presuit demand is to afford the defendant an opportunity to return the property to the one entitled to possession without being put to the expense and annoyance of litigation. However, a demand is not necessary before bringing suit in a replevin action where the circumstances indicate its futility." *Carroll*, 912 N.E.2d 272, 276 (citing *Nat'l Bond & Inv. Co. v. Zakos*, 230 Ill. App. 608, 612 (1923) ("where it appears that the defendant either before the action was instituted or upon the trial contests the plaintiff's rights upon the merits, or where it appears that a demand would have been of no avail, then none is required, for the law never requires the doing of a useless thing.")). So even were the Court to determine that Lewis' letter or other communications did not constitute a "presuit demand for the surrender of the [property], the record clearly establishes that any such demand would have been unavailing" because the Defendants say they do not, and never have, possessed the personal property. *Carroll*, 912 N.E.2d at 276. The Defendants contend there is no evidence of futility, but do not explain how a demand for the property could have changed the situation at all. Their argument is rejected.

Last, regarding conversion, MCS argues that Fermaint lacks evidence of damages, because he does not know the fair market value of the missing items. MCS Memo at 4. The Court, however, rejects that argument. As Fermaint argues, there are alternative methods of establishing damages

based upon the missing personal property. *Jensen v. Chicago & W. Indiana R. Co.*, 94 Ill. App. 3d 915, 934-35, 419 N.E.2d 578, 594 (1981) (explaining that unique property may not be susceptible to the general, fair market value measure of damages, but that does not limit recovery to nominal damages, because value may be determined by production cost, replacement cost, or actual value to the plaintiff). Fermaint provided evidence, including testimony as to the condition of the missing property, the prices he paid, and the replacement cost for various items. That evidence suffices as proof that he incurred damages; the amount of those damages is a question for the jury to determine based on its assessment of the credibility and quality of that evidence.

## V.  ICFA

Planet and MCS argue separately that the ICFA claims against them should fail, but they make many of the same arguments. Planet contends that (1) there is no evidence that it committed a deceptive act or practice and (2) its conduct did not proximately cause any injury. Joint Memo at 15. Similarly, MCS argues that there is no evidence of deception by MCS, no evidence of its intent that Fermaint rely on any statement it made, and no proximate cause between its conduct and Fermaint's alleged damages. MCS Memo at 5. The Court agrees, granting summary judgment on the ICFA deception claims but denying summary judgment on the unfairness claims.

The ICFA is "a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 830 (7th Cir. 2014). "The statute provides redress for deceptive business practices and also for business practices that, while not deceptive, are unfair." *Sifuentes v. Rushmore Loan Mgmt. Servs., LLC*, No. 17 C 3982, 2018 WL 1469014, at *3 (N.D. Ill. Mar. 26, 2018). "To establish an ICFA claim based on deceptive conduct, the plaintiff must prove the following elements: '(1) the defendant committed a deceptive

act or practice; (2) the defendant intended for the plaintiff to rely on the deception; (3) the deception happened in the course of trade or commerce; and (4) the deception proximately caused the plaintiff's injury.'" *Obradovich*, 2020 WL 2767578 at *7 (quoting *Cocroft v. HSBC Bank USA, N.A.*, 796 F.3d 680, 687 (7th Cir. 2015) (showing of actual reliance is not required)). "Meanwhile, three considerations guide a court's determination of whether conduct qualifies as unfair under the ICFA: '(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers.'" *Obradovich*, 2020 WL 2767578 at *7 (quoting *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 669 (7th Cir. 2008)). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 418, 775 N.E.2d 951, 961 (2002).

Planet and MCS first argue that Fermaint has no evidence that they engaged in any deceptive act or practice. Fermaint specifically alleges that it was deceptive for the Defendants to "employ self-help," circumvent the judicial process by taking possession without a court order, and "declare the Property abandoned and subject to confiscation." FAC ¶¶ 102-04. But the Defendants insist that there is no evidence of any misrepresentation made to Fermaint, and no evidence that either defendant claimed the Property was abandoned. MCS also insists that the only evidence of any communication between it and Fermaint were vacancy postings placed on the front door, and its vacancy determinations were in good faith because the Property was in fact vacant. In addition, says MCS, it had no role in the foreclosure or short sale process at all. Fermaint, for his part, argues that the Defendants' skirting of the foreclosure process, self-help repossession,

and disregard of Illinois law constitutes deceptive conduct, but he cites no case law in support. Joint Memo Resp. at 23-24.

The Court agrees with the Defendants that there is simply no evidence of deception or fraud in this case. *McKenney-Becker v. Safeguard Properties, LLC*, No. 14-CV-04514, 2015 WL 170520, at *10 (N.D. Ill. Jan. 13, 2015) (although the plaintiffs alleged that the defendants broke in and changed locks without permission or a court order, they "failed to adequately allege any deception on the part of Safeguard and ATC" because there were "no allegations of fraudulent statements or communications that occurred between Plaintiffs and Safeguard/ATC which, under Illinois law, is a requirement for an action under the ICFA."); *Alqaq v. CitiMortgage, Inc.*, No. 13 C 5130, 2014 WL 1689685, at *2, 4 (N.D. Ill. Apr. 29, 2014) (the defendants broke into the locked and secured house and winterized it, but "[t]here is no allegation that plausibly reveals an intent to deceive on the part of any defendant."). Unauthorized entry or possession, as alleged here, simply does not amount to deception.

Fermaint's unfair conduct theory fares better. Planet insists that Fermaint cannot prove unfair conduct, pointing to the Mortgage terms. Joint Memo at 18. As discussed above, though, the Court finds there is a genuine dispute of material fact regarding whether the Mortgage authorized the Defendants' conduct. Again, Planet provides no reason why it needed to access the interior of the Property in August, during the short sale process, when Lozano's lock secured the Property and it had encountered Fermaint at the Property in June.

Planet further argues that its conduct was not unfair because (1) the Property was already vacant, giving it no reason to pressure Fermaint to leave or abandon the Property in an effort to shorten the foreclosure process, (2) the "Initial Secure imposed no pressure on [Fermaint] to agree to the short sale because he was unaware the house had been secured for several weeks after the

contract had been signed," and "the deal [Fermaint] made with the buyers on August 31, 2018 was accepted by PHL so Plaintiff's short sale was unaffected by the Initial Secure." Joint Memo at 18. MCS echoes those arguments, including that Fermaint consented to entry via the Mortgage and had already vacated the Property. MCS Memo at 7-8.

Disregarding the personal property Fermaint alleges was stolen, the Court agrees that the damages ultimately suffered by Fermaint because of the Initial Secure may be minimal. In analyzing the conduct for unfairness, however, the Court considers not only the resulting injury but also "whether the practice offends public policy" or "is immoral, unethical, oppressive, or unscrupulous." *Obradovich*, 2020 WL 2767578 at *7. As articulated above, a reasonable juror could determine that the Defendants' actions here, which dispossessed Fermaint of his house for a month, were oppressive or offended public policy. *Id.* at *8 ("[A] jury could conclude that invading and modifying the property of a homeowner in the manner claimed by the Obradoviches was sufficiently oppressive. Because the Counterclaim Defendants changed the locks on the Property without the Obradoviches' consent, they had 'little alternative except to submit to' the modifications.") (internal citation omitted); *see Boyd*, 787 F. Supp. 2d at 756 (ransacking and dispossession "offended public policy as embodied in the IMFL" because "the presumptive right to possession during foreclosure rests with the mortgagor of the residential real estate"); *Bywater*, 2014 WL 1256103 at *3 (self-help to take possession outside judicial process is an unfair act); *Sifuentes*, 2018 WL 1469014 at *4 (noting that the Illinois Supreme Court in *Schweihs* did not mention the Consumer Fraud Act).

Finally, with regard to the ICFA claims, Planet argues that its actions cannot support a punitive damages award. The Court agrees. Under Illinois law, punitive damages are not awarded for acts constituting mere inadvertence, mistake, and errors of judgment, but "only for . . . conduct

involving some element of outrage similar to that usually found in crime. The conduct must be outrageous, either because the defendant's acts are done with an evil motive or because they are done with reckless indifference to the rights of others.[.]" *Fogt v. 1-800-Pack-Rat, LLC*, 2017 IL App (1st) 150383, ¶ 83, 74 N.E.3d 186, 202-03 (quoting *Loitz v. Remington Arms Co.*, 138 Ill. 2d 404, 416, 563 N.E.2d 397, 402 (1990) ("In this context, willful and wanton misconduct approaches the degree of moral blame attached to intentional harm, since the defendant deliberately inflicts a highly unreasonable risk of harm upon others in conscious disregard of it.") (internal quotations and citation omitted)). Given that the Defendants posted a notice of vacancy and conducted numerous occupancy inspections, the Property was in fact vacant, and there is no evidence that removal of Fermaint's personal property was within the scope of any agency agreement, the conduct falls below the intentional level required for an award of punitive damages. *Fogt*, 74 N.E.3d at 204 ("Such efforts cannot be characterized as indicative of an evil motive or indifference to the rights of the plaintiffs."); *compare Thakkar*, 2019 WL 2161544 at *8-9 (finding removal of personal property within the scope of the agency relationship where work orders anticipated removal of anything in the house, unlike the work orders in this case, which expressly stated that personal property was not to be removed). Indeed, a reasonable juror could conclude that the Defendants took reasonable measures to preserve and protect the Property, such as documenting its condition with photographs and effectively securing the premises. Fermaint argues that the "question of whether a defendant's conduct was sufficiently willful or wanton to justify imposing punitive damages is generally for the jury to decide," characterizing Planet's conduct as outrageous. *Barton v. Chicago & N. W. Transp. Co.*, 325 Ill. App. 3d 1005, 1031, 757 N.E.2d 533, 555 (2001). While punitive damages may be awarded in cases of trespass or for violations of the ICFA, the question of punitive damages need not be left for the jury in cases like this, where no

evidence of malice or deliberate indifference could support such damages. *See Parks v. Wells Fargo Home Mortg., Inc.*, 398 F.3d 937, 943 (7th Cir. 2005) (vacating punitive damages).

## VI. Negligence

In stating his negligence claim, Fermaint contends that the Defendants breached their duty by "(a) failing to protect or secure Plaintiffs' property; (b) violating the law; (c) failing to follow their own formalized procedures; and (d) failing to use reasonable care when 'securing' the subject property." FAC ¶ 123-24 (the Defendants contributed to and enabled "the dispossession of Plaintiffs' real and personal property, and by failing to prevent any loss or damage after voluntarily exercising control and dominion over the Plaintiffs' property."). The Defendants argue that Fermaint's negligence claim must fail because their conduct did not violate any duty or standard of care and resulted in no damages. *See Thakkar*, 2019 WL 2161544 at *10 ("Under Illinois law, in a negligence action, a plaintiff 'must plead and prove the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and injury proximately resulting from that breach.").

The Court disagrees that no duty existed here. True, there is no evidence that MCS's vendor secured the Property negligently, by, for example, placing a faulty lock on the door. Fermaint admits that the Property was already ransacked when the Defendants took pictures of the Property on August 31, 2018, and he concedes that he was not able to subsequently access the Property until the Defendants gave his realtor the lockbox code. But as the Court previously discussed, it rejects the argument that the Mortgage authorized the Defendants' actions as a matter of law. The mere act of securing the Property and dispossessing Fermaint, in and of itself, therefore, could be considered a breach of duty. *Thakkar*, 2019 WL 2161544 at *5, 10 (finding that one could conclude

that Ocwen's entry was not reasonable, it exceeded its legal authority, and it "owed Thakkar a duty of ordinary care").

There is no evidence, however, that Fermaint suffered any damages as a proximate result of the Defendants' negligence. Planet ultimately approved Fermaint's short sale and forgave his debt. True, Fermaint was locked out of his Property for some time, but he did not live there and he points to no damages flowing from his temporary dispossession. Unlike the plaintiff in *Thakkar*, Fermaint does not allege that by being dispossessed, he "was forced to hire a locksmith to replace deadbolts and fix his patio door." *Thakkar*, 2019 WL 2161544 at *11 ("The harms of being locked out of his house and having to expend money to reenter the property and replace the locks are cognizable legal injuries."). This situation also stands in contrast to *Obradovich*, where the plaintiff "adduced evidence that [the defendant] damaged the Property by failing to drain all water from the plumbing system," resulting "in mold damage." *Obradovich*, 2020 WL 2767578 at *9. And even though some of Fermaint's personal property was taken from the house, Fermaint identifies no action that the Defendants reasonably should have taken, but did not, to prevent that taking—in other words, there is no evidence that the Defendants breached their duty of ordinary care. Because Fermaint points to no evidence of damages proximately caused by the Defendants' breach of its duty of ordinary care, summary judgment is granted for the Defendants on the negligence claim.

## VII. FDCPA

In stating his FDCPA claim, Fermaint alleges that the Defendants "violated § 1692f(6) by taking illegal non-judicial action" by changing the locks and taking possession of his Property, or ordering MCS to do so. FAC ¶¶ 133-49. The FDCPA regulates the conduct of debt collectors and forbids using "unfair or unconscionable" means to collect a debt, as well as "any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the

collection of a debt." 15 U.S.C. § 1692e, f. "Under 15 U.S.C. § 1692f(6), it is an 'unfair or unconscionable' practice for anyone who does not have a present right to possession of the property to take or threaten 'nonjudicial action to effect dispossession or disablement of property.'" *Sifuentes*, 2018 WL 1469014 at *2.

The Defendants, arguing separately, urge the Court to grant them summary judgment on Fermaint's FDCPA claims. Each argues primarily that they are not debt collectors within the meaning of the statute. Section 1692a(6) of the FDCPA provides three ways that an entity might qualify as a debt collector. It defines a "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the ***principal purpose*** of which is the collection of any debts, or who ***regularly collects*** or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due ***another***." 15 U.S.C. § 1692a(6) (emphases added). Thus, one can qualify as a debt collector under the "principal purpose" prong, the "regularly collects" prong, or both. *See Skibbe v. U.S. Bank Tr., N.A. for LSF9 Master Participation Tr.*, 309 F. Supp. 3d 569, 574 (N.D. Ill. 2018) (describing the "prongs"). Third, for purposes of Section 1692f(6), the statute provides a "separate and potentially more expansive definition," stating that a debt collector "'also includes any person who uses any instrumentality of interstate commerce or the mails in any business the ***principal purpose of which is the enforcement of security interests***.'" *Griffin*, 2020 WL 6118572 at *10 (quoting 15 U.S.C. § 1692a(6)) (emphasis added).

Planet first argues that it is not a debt collector under either the "principal purpose" prong or the "regularly collects" prong. It asserts that its principal business is not collecting debts, but servicing loans, which includes processing payments, maintaining records, collecting and making disbursements, sending monthly statements, and providing customer service. It also contends that it does not "regularly collect" debts because to qualify, it must collect debts on behalf of others.

47

*Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 83 (2017) (a debt purchaser "may indeed collect debts for its own account without triggering the statutory definition"). Planet owned Fermaint's debt, it says, and therefore acted only on behalf of itself. Next, Planet contends that summary judgment is warranted because property preservation is not an attempt to collect a debt under the FDCPA. Joint Memo at 23 (characterizing the changing of the locks as "what one does to secure a vacant home, not what one does to collect a debt."); *see Schlaf v. Safeguard Prop., LLC*, 899 F.3d 459, 466-68 (7th Cir. 2018) ("the FDCPA is aimed at curbing abuses by third-party debt-collection agents who are much more involved in actual debt collection than Safeguard, whose primary purpose is property preservation."); *Griffin*, 2020 WL 6118572 at *10 ("The fact that they secured and winterized the home does not make them indirect debt collectors; 'such specific and very limited action' does not implicate the FDCPA's specific statutory concerns.") (quoting *Schlaf*). Last, with regard to Section 1692f(6), Planet urges the Court to grant summary judgment because Planet did not dispossess Fermaint of the Property, but merely entered and secured it, and even if it did possess the Property, it had a right to do so. Joint Memo at 24.

In response, Fermaint insists that Planet's principal purpose is debt collection, even if it happened to own Fermaint's particular debt. Joint Memo Resp. at 32 ("the Supreme Court [in *Henson*] did not set out to answer whether an entity who also regularly acts as a third-party debt collector and collects defaulted debt for itself is a debt collector"). He then appears to argue that the Court should infer, based on Planet's concessions and the fact that "loan origination is not listed as one of Planet's business activities," that its principal business is debt collection. *Id.* ("One need not struggle to discern from Planet's affidavit or the general function of loan servicing to deduce that Planet engages in debt collection. [ ] Considering no other real business outside of debt collection is mentioned, an inference exists that Planet's principal business is the collection of

debts."). Fermaint also contends that a question of fact remains whether Planet is collecting Fermaint's debt for another, because the affidavit used in Fermaint's foreclosure case "discloses nothing more than 'servicing rights.'" Joint Memo Resp. at 33. Fermaint concludes by reiterating his arguments regarding the Defendants' conduct in the context of the IMFL. *Id.* at 34-35 ("Planet had no right to take possession, change locks or order entry[.]").

While the Court agrees with Planet on certain points related to the FDCPA claims, it denies summary judgment for Planet. True, under neither of the first two definitions in Section 1692a can Planet be deemed a debt collector. *See Skibbe*, 309 F. Supp. 3d at 574 (granting summary judgment because "no reasonable jury could find that U.S. Bank does not own the loan at issue" and the plaintiff "never alleged that the primary purpose of U.S. Bank's business was debt collection"). For one, there is no evidence by which to infer that Planet's principal business is debt collection. In fact, Fermaint admits that only approximately six percent of the loans serviced by Planet are in default at any one time, so there is evidence that servicing non-defaulted loans—which does not constitute "debt collection"—makes up most of Planet's business.[13] *See Messina v. Green Tree Servicing, LLC*, 210 F. Supp. 3d 992, 1000 (N.D. Ill. 2016) ("The FDCPA's definition of debt collector . . . excludes any person collecting or attempting to collect 'a debt which was not in default at the time it was obtained by such person.'"). In addition, the Court finds no inconsistency in the affidavits cited by Fermaint, and Fermaint concedes that Planet had purchased the loan, so it was not collecting that debt for a third-party. SOF Resp. ¶ 10. There is also no evidence that Planet regularly collects debts owed to others, and speculation about "whether and to what extent

---

[13] Fermaint even concedes in his response to the Defendants' joint statement of facts that Planet's "principal business is servicing loans[.]" SOF Resp. ¶¶ 2-3.

Planet's defaulted debt[s] are owned by Planet or a third party" is not sufficient to survive summary judgment on this issue. Joint Memo Resp. at 33.

That still leaves, however, the third definition, for purposes of Section 1692f(6)—one who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests. 15 U.S.C. § 1692a(6). As pointed out by Fermaint, that definition was never discussed in *Schlaf*. 899 F.3d at 459-70. Here, the "undisputed evidence establishes that [Planet] acquired the debt owed by" Fermaint and "acquired servicing rights for the Loan after it was already in default." *Obradovich*, 2020 WL 2767578 at *10 (citing *Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 536 (7th Cir. 2003) (FDCPA "treats assignees as debt collectors if the debt sought to be collected was in default when acquired by the assignee, and as creditors if it was not.")). As previously discussed, there is a genuine dispute of fact regarding the reasonableness of the Defendants' conduct. Therefore, "[b]ased on the record, a reasonable jury could find that [Planet] hired [MCS] to enter and winterize [the] Property to collect on a debt" and enforce its security interest, making Planet a debt collector for purposes of the statute. *Obradovich*, 2020 WL 2767578 at *10-11 (denying summary judgment as to Seterus, the loan servicer, "because Seterus may qualify as a debt collector under the FDCPA and the Obradoviches have created a genuine dispute as to whether it engaged in unfair debt collection practices under § 1692f(6)").

The Court also rejects Planet's argument that it either did not dispossess Fermaint of his Property or had the right to do so. As discussed already, though the Property was vacant, the Defendants took possession by replacing Fermaint's realtor's lock with its own and denying Fermaint access. There is a question of fact regarding whether the Defendants had the right to take possession pursuant to the Mortgage, and summary judgment is therefore denied. *See Obradovich*,

2020 WL 2767578 at *10-11 (the plaintiffs "demonstrated a genuine dispute of fact as to whether Seterus violated § 1692f(6) when it directed its contractor to enter the Property without permission, change the locks, and winterize it prematurely.").

With regard to MCS, although the Court again agrees with the Defendants that MCS is "not [a] debt collector[ ] under the FDCPA's general definition[,]" the Court denies summary judgment "for the portions of this count that rely on § 1692f[.]" *Griffin*, 2020 WL 6118572 at *10-11 ("Safeguard and Alissa argue that they are not enforcers of security interests, but a reasonable jury could find otherwise."). MCS is correct that it did not communicate a demand for payment or ever refer to Fermaint's Mortgage debt or foreclosure, and that property preservation services generally do not trigger the FDCPA. *See Obradovich*, 2020 WL 2767578 at *9 ("[I]ndirect action taken without reference to a debt is not sufficient to trigger the protections of the statute."); *Hunte v. Safeguard Properties Mgmt., LLC*, 255 F. Supp. 3d 722, 725 (N.D. Ill. 2017) (dismissing FDCPA claim because the complaint's allegation that the defendant's "principal purpose [is to] manage and preserve at-risk and foreclosed properties" established that the defendant was not a debt collector); *Platek v. Safeguard Properties Inc.*, No. CIV.A. 12-1607, 2014 WL 2808908, at *1 (W.D. Pa. June 19, 2014) (granting motion to dismiss where the plaintiff alleged that "he was dispossessed of personal property as a result of Safeguard's post-foreclosure 'winterizing,'" because "deeming the fulfillment of preservation duties as 'debt collection' misconstrues the 'principal purpose' of such activity, and, thus, falls outside the scope of the FDCPA."). Fermaint argues, however, that "MCS takes orders from Planet as the mortgage servicer and, acting as Planet's conduit, issues a work order to its local contractor to invade consumer's homes, lock them out, take possession and remove their property in violation of the IMFL." MCS Memo Resp. at 9.

In this case, there is sufficient evidence to support a jury's verdict that MCS took "actions with respect to property that is possessed by a third-party based on the orders of a creditor with a security interest. Thus, property preservation, like repossession, can amount to enforcement of a security interest." *Griffin*, 2020 WL 6118572 at *10; *see Sifuentes*, 2018 WL 1469014 at *3 (where property was neither vacant nor abandoned and "Safeguard entered it, changed the locks, and seized certain of Plaintiff's personal items . . . attempting to enforce a mortgage security interest by way of locking a borrower out of his property is conduct prohibited by § 1692f(6) of the FDCPA."); *Bywater*, 2014 WL 1256103 at *5 (allegations permitted the "plaintiff to take advantage of a broader definition of 'debt collector'" under Section 1692f(6), and those allegations "are sufficient to bring [the property preservation defendant and the subcontractor defendant] within this expanded definition for purposes of liability under subsection 1692f(6)."); *but see Obradovich*, 2020 WL 2767578 at *10 (finding the servicer defendant, Seterus, was a debt collector, but YJM and Safeguard were not, because "none of the evidence suggests that YJM or Safeguard attempted to collect a debt owed under the Mortgage. YJM and Safeguard merely relied upon the Mortgage as authorization for entry into the Property—the Mortgage gave Fannie Mae and Seterus a right to enter or secure the Property under specific circumstances, and Fannie Mae and Seterus contracted with Safeguard, which subsequently contracted with YJM, to exercise that right on Fannie Mae's and Seterus's behalf."). MCS attempts to distinguish this case from *Griffin* by pointing out that the property in that case was occupied, and the contractor there changed the locks despite being provided notice that the property was occupied. MCS thus appears to argue that its conduct here was less objectionable. As discussed, however, there is a question of fact regarding whether the conduct here was reasonable. A reasonable juror could find that Planet and

MCS were thus enforcing security interests and effecting dispossession of the Property, so summary judgment on the FDCPA claims is denied.

## VIII.    Breach of Contract

Fermaint asserts that Planet breached the Mortgage contract because it "never provided [him] with reasonable notice or reasonable cause prior to the entry into the property," thus breaching the Mortgage terms and violating Illinois law. FAC ¶¶ 158-59. To the extent that this claim asserts that the Defendants' actions were not reasonable, the Court agrees that a jury must assess their reasonableness as already discussed. To the extent that Fermaint asserts that the Defendants failed to comply with a notice requirement in the Mortgage, however, he is off-the-mark. Fermaint asserts that this notice requirement is found in Paragraph 7 of the Mortgage and purports to quote that paragraph as providing that "Lender or its agents may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause." FAC ¶ 153. Paragraph 7 of the Mortgage, however, says no such thing; rather, it addresses the Borrower's obligation to pay "governmental or municipal charges, fines and impositions" and the Lender's remedies for a breach of that obligation. The provision does state that "Lender may do and pay whatever is necessary to protect the value of the Property," but it imposes no notice requirement on the Lender. So, too, Paragraph 17, which addresses the assignment of rents; that paragraph expressly permits the Lender to "enter upon, take control of or maintain the Property . . . at any time there is a breach." So far as the Court can see, neither Paragraph 5 nor any other provision of the Mortgage sets forth a requirement for providing notice of the basis for entry to inspect or secure the property.

Planet also contends, in any event, that whether it breached the Mortgage is "ultimately irrelevant" because Fermaint's prior breach in failing to make payments precludes his breach of contract claim. Joint Memo at 25 (citing *Daniggelis v. Pivan*, 159 Ill. App. 3d 1097, 1103, 513 N.E.2d 92, 96 (1987) ("It is also a well established general rule that 'a party to a contract who commits the first breach of its terms cannot maintain an action for a subsequent breach by the other party.'") (quoting *Kosuga v. Kelly*, 257 F.2d 48, 56 (7th Cir. 1958)); *Fireman's Fund Mortg. Corp. v. Zollicoffer*, 719 F. Supp. 650, 657 (N.D. Ill. 1989) ("[U]nder Illinois law, the Zollicoffers' material breaches of the Mortgage . . . prior to any alleged breach by FFMC, precludes the Zollicoffers' recovery under their counterclaim for Breach of Mortgage Contract.")).

In his one-paragraph response supporting his breach of contract claim, Fermaint reiterates that the IMFL controls Planet's right to take possession and argues that the fact of his prior default under the Mortgage is "irrelevant." Joint Memo Resp. at 35 (incorporating Section II of his response brief, titled, "The Lawfulness of the Defendants' Entry into Fermaint's Property Must Be Determined By Reference to Illinois Law."). But nowhere in that paragraph or the approximately eight pages of Section II does Fermaint (1) explain why his prior default is irrelevant to his breach of contract claim, (2) respond to *Daniggelis*, *Kosuga*, or *Zollicoffer*, (3) or cite supporting case law on the point. Because Planet's cited cases are persuasive, and Fermaint fails to adequately respond to the argument, summary judgment is granted in favor of Planet on the breach of contract claim. *See Tracie E. v. Saul*, No. 120CV00307SEBMPB, 2021 WL 1135834, at *2 n.3 (S.D. Ind. Mar. 25, 2021) ("[B]y failing to include any reference to any legal doctrine or authority in support of this claim or otherwise adequately develop it in any fashion, we consider [the argument] waived.") (citing *United States v. Adams*, 625 F.3d 371, 378 (7th Cir. 2010) (failing to develop argument in any meaningful way waives that argument); *United States v. Elst*, 579 F.3d 740, 747 (7th Cir.

2009) ("Perfunctory and undeveloped arguments as well as arguments unsupported by pertinent authority are waived.")).[14]

## IX.    Civil Conspiracy

In his civil conspiracy claims against the Defendants, Fermaint asserts that they agreed to a common scheme to "ignore the possessory rights of homeowners in violation of the law, expedite the foreclosure process by circumventing the law, and profit from unlawful trespasses to valuable real and personal property." FAC ¶¶ 165-70 (conspiratorial acts included "improper 'vacancy' determinations, ignoring notices from homeowners stating the property is not vacant or abandoned, trespassing on the property, changing locks, restricting access, tampering with the utilities, and conversion of personal property therein" and changing "locks in Illinois . . . without having the required license to change locks in Illinois under the Illinois Locksmith Act.").

"Illinois recognizes civil conspiracy as a distinct cause of action." *Lewis v. Lead Indus. Ass'n*, 2020 IL 124107, ¶ 19, 178 N.E.3d 1046, 1053 ("The function of a [civil] conspiracy claim is to extend liability in tort beyond the active wrongdoer to those who have merely planned, assisted or encouraged the wrongdoer's acts."). "The elements of a civil conspiracy are: (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of

---

[14] The Court notes that in *Griffin*, the court denied summary judgment on the breach of contract claim while noting that the plaintiff had defaulted on her loan. This case therefore might seem to support the proposition that a breach of contract claim based on illegal entry can survive summary judgment even if the mortgagor had already defaulted when the illegal entry occurred. 2020 WL 6118572 at *7. But in its opinion, the court was responding to the defendant's argument that the "mortgage authorized it to perform property preservation services" and that "[b]ecause Griffin defaulted on her loan . . . she cannot claim that Alissa's entry was a trespass." *Id.* The court rejected that argument because the plaintiffs maintained that the defendant engaged in unreasonable actions "once it entered the property[.]" *Id.* The court did not consider the argument made here that a prior default precludes any breach of contract claim.

which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston*, 209 Ill. 2d 302, 317, 807 N.E.2d 461, 470 (2004).

The Defendants make three arguments in urging the Court to grant summary judgment as to Fermaint's civil conspiracy theory. First, they argue that there is no evidence that they entered into an agreement for an unlawful purpose or a lawful purpose by unlawful means. Joint Memo at 26 (citing *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 140, 720 N.E.2d 242, 261 (1999) (civil conspiracy cases based on circumstantial evidence require clear and convincing evidence) and *Amundsen v. Chicago Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000) (affirming summary judgment for the defendants and explaining that "[b]ecause the plaintiff's allegations are nothing more than bald assertions without any evidentiary support, we hold that they are insufficient to establish that the defendants conspired to deprive him of his constitutional rights")). They insist that the only evidence of such an agreement is that the Defendants were tied by contract to securing the property, which cannot justify denial of summary judgment. *See Bullard v. U.S. Bank, N.A.*, No. 3:10CV434-MCR/CJK, 2012 WL 2542907, at *5 (N.D. Fla. June 30, 2012) (the "only evidence of conspiracy is the fact that multiple companies were involved in the alleged civil theft and that Five Brothers had a representative permanently located at U.S. Bank's headquarters due to the two corporations' frequent work together," and no cited case law "would permit a jury to reasonably infer a conspiracy based merely on a working relationship between two corporations"). Next, they argue that no unlawful activity occurred. Finally, they argue that the civil conspiracy claims are merely duplicative of the underlying torts Fermaint alleges, and because the alleged conspiracy did not cause damages beyond those individual torts, the conspiracy claim must fail. *See Powell v. City of Berwyn*, 68 F. Supp. 3d 929, 950 (N.D. Ill. 2014) (Because "Plaintiff does not allege any additional defendants or facts in the conspiracy claim as

compared to the malicious prosecution claim . . . the state law civil conspiracy claim is duplicative."); *Davis Companies, Inc. v. Emerald Casino*, *Inc.*, No. 99 C 6822, 2003 WL 22113414, at *9 (N.D. Ill. Sept. 11, 2003) (granting summary judgment on civil conspiracy claim because a "civil conspiracy that alleges a tort as the underlying wrongful act is actionable so long as the claim includes additional defendants or new facts not already pled in the underlying tort . . . [otherwise,] a conspiracy count would merely result in another attempt to recover the same damages."); *Niehus v. Liberio*, 973 F.2d 526, 531 (7th Cir. 1992) (rejecting the argument that the district court judge improperly dropped the conspiracy count, noting that the plaintiffs' lawyer "acknowledged at argument that these counts would be moot if we affirmed the judgment for [the plaintiff], since the conspiracy and malicious prosecution are not alleged to have inflicted any injury beyond that of the excessive force itself.").

The Court disagrees with the Defendants. True, the FSA and VSA do not specifically articulate an unlawful purpose, nor do they require any unlawful means to be executed. But the evidence in this case could support a jury verdict that Fermaint suffered a trespass, and that the Defendants committed an overt wrongful act to accomplish that trespass. After Fermaint personally turned away a vendor from his Property and informed the vendor that the Property was not vacant, the Defendants together authorized another vendor to secure the Property and dispossess Fermaint from his Property, while knowing that Fermaint was preparing to sell the Property. There is, thus, evidence sufficient to support a verdict that Planet and MCS conspired to commit that unlawful act or purpose. *Thakkar v. Ocwen Loan Servicing, LLC*, No. 15 CV 10109, 2019 WL 2161544, at *14 (N.D. Ill. May 17, 2019) (denying summary judgment on civil conspiracy claim because "[i]t is true, of course, that there is nothing unlawful about entering into agreements to provide property preservation services. But [the plaintiff] has alleged that the

defendants engage in a number of questionable practices in carrying out these contracts. . . . In short, [the plaintiff] has put forward sufficient evidence to allow a jury to conclude that the way in which these agreements were operationalized was designed to violate individuals' property rights."). Further, Fermaint's civil conspiracy claim is not duplicative of his underlying tort claims. As Fermaint argues, this claim is "an active safety net . . . providing an additional path to impose liability upon Planet and MCS for the acts of the contractors." Joint Memo Resp. at 38. If Fermaint's agency theory fails because the vendors were not agents of the Defendants, he may yet be able to recover if he proves that the Defendants conspired to accomplish a trespass. Summary judgment is denied on the civil conspiracy claims.

\* \* \*

For the foregoing reasons, summary judgment is granted for the Defendants on Fermaint's ICFA deceptive practices, negligence, FDCPA § 1692(a)(6) "regularly collects" and "principal purpose," and breach of contract claims. Fermaint's other claims—conversion, trespass to real property and trespass to chattels, ICFA unfair practices, FDCPA (§ 1692f), and civil conspiracy—survive the present motions.

Dated: August 15, 2023

John J. Tharp, Jr.
United States District Judge